In re KROH BROTHERS DEVELOP-MENT COMPANY, Beverly Plaza Associates, Debtors.

BEVERLY PLAZA
ASSOCIATES, Plaintiff,

v.

B. Francis SAUL, II and Garland J. Bloom, Jr., Trustees, B.F. Saul Real Estate Investment Trust, Defendants.

Bankruptcy Nos. 87–00640–1–11, 87–01631–1–11.
Adv. No. 87–0231–1–11.

United States Bankruptcy Court,
W.D. Missouri, W.D.

Sept. 2, 1988.

See also 88 B.R. 997.

Arthur B. Federman, Douglas Carter, Kansas City, Mo., for Beverly Plaza.

James Polsinelli, James Bird, Kansas City, Mo., for Kroh Brothers Dev. Co.

Leslie A. Nicholson, Jr. and Thomas C. Hill, Washington, D.C., Dennis M. Alt and T. Patrick Tinker, Kansas City, Mo., for defendants.

## MEMORANDUM OPINION AND JUDGMENT

KAREN M. SEE, Bankruptcy Judge.

Beverly Plaza Associates, a limited partnership ("Beverly"), filed a Chapter 11 case in April 1987. Earlier, its general partner Kroh Brothers Development Company ("Kroh") filed under Chapter 11 on February 13, 1987. The Saul Real Estate Investment Trust seeks determination that the automatic stay does not apply to a state court declaratory judgment action against Beverly. Alternatively, Saul requests relief from the stay. Subsequently, Beverly filed this action, in which Saul filed a counterclaim against both Beverly and Kroh. The motion and action have common questions of law and fact, so for judicial economy they were consolidated for trial.

Beverly seeks judgment that its Ground Lease with Saul is in effect and Beverly has title to improvements; turnover of rents collected by Saul; damages for tortious interference with Beverly's leases and breach of contract; recovery of a transfer as preferential and fraudulent; and punitive damages on all relevant counts. Saul requests determination that the stay is inapplicable or alternatively, termination of the stay; judgment that the Ground Lease was terminated and Saul owns improvements; an accounting; and damages for breach of contract.

Beverly did not include a specific count for violation of the automatic stay as to Kroh. However, its response to Saul's motion to terminate stay argues the issue; Count I of Beverly's complaint, which seeks declaration that the leasehold is not terminated, alleges violation of the stay as to Kroh and requests attorney fees; evidence of violation of stay was presented at trial; and the parties' post-trial briefs address the issue in full. The issue has been tried by consent of the parties. The pleadings are deemed amended to conform to the evidence and the issues on violation of stay are under submission. Bankr.R. 7015; F.R.C.P. 15(b).

## I. FINDINGS OF FACT

To the extent the following findings of fact constitute conclusions of law or vice versa, they shall be so construed.

### A. Background

Beverly is a Wyoming limited partnership. It now has two general partners: Kroh and Beverly Plaza Partners, Inc. ("BP Partners"). Until February 5, 1987, Kroh was Beverly's sole general partner. Saul is a common law unincorporated business trust organized in Washington, D.C. It has a national reputation in commercial real estate, owning about 100 commercial properties throughout the nation.

In 1974, Saul entered a Ground Lease on land in Casper, Wyoming. The original lessee's interest has been conveyed twice; in 1977, Beverly became lessee under the Ground Lease. A Supplemental Memorandum of Lease between Saul and Beverly affirmed this conveyance. The Ground Lease created a 50–year tenancy with options to allow the tenant to renew the Lease through the year 2073. During a three year period from 1994 to 1997, the tenant may exercise an option to purchase the land.

### B. The Shopping Center

The Beverly Plaza Shopping Center, built on the land, has 150,000 square feet of leasable space. It is Beverly's only significant asset. Tenants at the center are par-ties to leases with Beverly. The leases require tenants to pay Beverly monthly rent, which is Beverly's principal source of income.

The shopping center was constructed by the original ground lessees and not by Saul. It was built after a 1974 purchase leaseback transaction. Saul purchased the land from the original tenants for $500,000 and leased it back to them; in turn, the tenants constructed the shopping center. The ground lessee owns all improvements, including the shopping center. However, the improvements revert to Saul, the landlord, in the event of an uncured default after proper notice under Lease Article 12.

The parties stipulated to $5.5 million as the shopping center's fair market value in February 1987. There is a single mortgage with a balance of about $1.5 million according to bankruptcy schedules (and 1987 business records created by Saul). Thus, in February 1987 equity in the center was about $4 million. Furthermore, under Beverly and Kroh the shopping center operated at a profit with good cash flow. This was not one of the Kroh–related limited partnerships which was forced to file bankruptcy due to insufficient cash flow to pay operating expenses or service debt.

From 1975 through October 1986, Saul received all monthly payments due under the Ground Lease. Yearly totals varied from $52,500 to $87,076 depending on the percentage rental owed under Lease Section 3.01(b). On its initial $500,000 investment, Saul's annual return has ranged from 10.5 to 17.41 percent. In gross dollars, Saul has received over $800,000.

From November 1986 through January 1987, Beverly failed to make three payments totaling $20,337. Payments were to be made by general partner Kroh, which had experienced financial problems since November 1986. One month's rent was paid February 3. Then, by letter dated March 2 Beverly tendered $34,769 for all past due sums and late fees. Saul refused to accept the tender.

### C. The Default Notice

Saul sent a default notice to Roger Hunt, a Kroh officer. The notice was dated Janu-

ary 29, mailed January 30, and received February 2. The notice (with emphasis added) states:

> Reference is made to that Lease Agreement dated April 11, 1974, by and between ... [Saul] as Landlord and *Kroh Brothers, successor Tenant.*
>
> Be advised that you are in default under said Lease due to your failure to pay *November, December and January rentals totalling $20,377.00* when due. Please be advised that if the above noted default is not *cured within fifteen (15) days of the date of notice hereof,* the Ground Lease shall terminate and all rights of Tenant under the Lease shall cease. Be advised that notwithstanding the termination of the Lease, you shall remain liable for all amounts due under said Lease together with late charges at the rate of 15% per annum and damages suffered or incurred by the Trust by reason of your breach of the Lease.
>
> If this default is not cured as stipulated above, you are hereby reminded that the *Lease shall expire at the end of said fifteen (15) day period.*

The default notice endeavored to invoke Lease Article 12, which contains specific notification procedures for terminating the Lease in the event of certain defaults. The dispositive Article 12 procedures are:

1) The landlord must notify the tenant by registered letter of the default.

2) The notice must allow tenant a 15 day period "from the date of actual receipt by Tenant" to cure the default.

3) The notice must specify a termination date which is after the 15 day cure period.

4) The notice must "notify Tenant that this Lease shall terminate on the date specified in said registered letter if said default is not cured within the fifteen (15) days regardless of and notwithstanding the fact that Landlord has or may have some other remedy under this Lease or by virtue hereof or in law or in equity."

 The default notice failed to comply with Article 12 requirements in the following respects:

1) *Incorrect identification of tenant.* No reference is made to the tenant, Beverly Plaza Associates. The notice incorrectly states it is directed to a tenant named "Kroh Brothers," and it is directed solely to "Roger K. Hunt, Senior Vice President, Kroh Brothers."

2) *Insufficient notice period.* The notice miscalculates the period for cure required in the Lease, cutting it by at least four days. Under Article 12, the 15 day period runs "from the date of actual receipt by Tenant of the registered letter." But the notice states the 15 days run from January 29, the date of the notice, thus giving only 11 days from receipt to cure.

Further, if not waived, common law applies in addition to lease requirements. *Francam Bldg Corp. v. Fail,* 646 P.2d 345, 348 (Colo.1982). Article 12 acknowledged common law, which requires a reasonable time to cure a default before a forfeiture. *Baker v. Jones,* 69 Wyo. 314, 240 P.2d 1165, 1171 (1952). Eleven days was insufficient.

3) *Failure to specify lease termination date.* The notice fails to specify a termination date; instead, it states the Lease will expire unless three months' rent is paid within 15 days of the date of notice. It is not equivalent to specifying a precise date as required by Article 12. Another ambiguity is whether the notice date, January 29, is included as the first of the 15 days.

4) *Failure to give notice regarding landlord's other rights.* The Lease requires the default notice to inform the tenant that termination will occur "regardless of and notwithstanding the fact that Landlord has or may have some other remedy under this Lease or by virtue hereof or in law or in equity." No such notification is in the notice.

5) *Incorrect demand date.* Unless a lease specifies otherwise, under common law a default notice must be given on the day rent falls due in order for forfeiture to follow. *Boyd v. Boone*

*Mgt. Inc.*, 676 S.W.2d 24, 27 (Mo.App. 1984); *accord, Angus Hunt Ranch v. Bowen*, 571 P.2d 974, 978 (Wyo.1977); 3A Thompson, Real Property § 1336, at 610 (1981). The lease does not waive the common law requirement and it was not met. Rent was due January 1. Notice was dated January 29, mailed January 30, and received by Kroh on February 2.

■ The Court finds the default notice was fatally defective and actively misleading as to applicable termination procedures. Kroh was in fact misled by the notice and believed that cure had to be accomplished by February 13, within 11 days after receipt.

*D. The Situation At Kroh*

When the default notice was received, Kroh was in a state of chaos, with extreme financial and managerial difficulties. By February, Kroh had laid off dozens of employees and was receiving scores of default notices weekly. Despite these difficulties, Mr. Hunt tried to pay Saul. Upon receiving the default notice, he forwarded it to the accounting department with directions to pay past due sums, but Mr. Hunt was not in charge of that department and had no control over whether the money was paid. It was not paid within the stated cure period due to Kroh's chaotic state of affairs. By coincidence, a one-month payment of $6,779 was made February 3, apparently not in response to the notice.

*E. Saul's Wrongful Efforts To Seize Shopping Center*

Saul follows Kansas City's real estate market because it owns two valuable properties in the metropolitan area. Its monitoring includes frequent discussions with a local real estate broker at Coldwell Banker and discussions with local and regional bankers. By January 1987 Saul was carefully monitoring Kroh's demise. When it sent the default notice, Saul's management understood the seriousness of Kroh's financial situation.

There was $4 million equity in the shopping center. Upon termination of the Ground Lease, improvements would revert to Saul. On January 29, when Saul attempted to invoke the default provisions to terminate the lease, according to the default notice Beverly owed $20,377 for three payments, exclusive of late charges (and that amount was soon reduced by the February 3 payment of $6,779). Undoubtedly, Saul was aware of the value of the lease improvements and the provision for reversion to Saul when it was attempting to terminate the Ground Lease and obtain title to the center.

In early February, Saul prepared to take over the shopping center immediately upon expiration of the cure period in the notice. An internal memorandum dated February 10, 1987, states that the cure period for Beverly Plaza ended February 17, there were no other defaults, and attorneys were in place in Wyoming to "take immediate action" after the cure period expired (Defendant's Exhibit 27). Saul hired Wyoming counsel to file a quit-claim deed and quiet title action, and arranged for its property management company, Franklin Management Company, to contact tenants. As early as February 13, Saul's property management company contacted tenants, telling them Saul was the new landlord and to pay future rent to Saul (See Defendant's Exhibit 43). This misinformation created confusion, causing many tenants to stop paying Beverly. Other tenants paid Saul $19,649.75 which it has retained.

When Saul took these actions, it knew the tenants were contractually bound to pay Beverly. Even if the default notice had been sufficient under Article 12, February 17, the fifteenth day after receipt, was the earliest possible date the lease could have terminated. At trial, in its internal memorandum and in its complaint filed in Wyoming state court Saul contended the Ground Lease terminated on February 17. Thus, on February 13, when Saul told tenants not to pay Beverly, it knew the leases were still in effect, that tenants were contractually bound to pay rents to Beverly, and that advising tenants not to pay Beverly would deprive Beverly of rents to which it was entitled.

Saul's knowledge of Kroh's financial difficulties and the swiftness with which it took action to have rent paid to it demonstrate that Saul's actions were intentional and for the purpose of causing tenants to stop paying Beverly in order to oust Beverly. Saul knew the shopping center was very profitable and that by promptly terminating the Ground Lease and appropriating the shopping center and tenants, Saul would receive a $4 million windfall. Saul's acts concerning shopping center tenants were done intentionally, without valid justification or excuse, and for the specific purposes of causing tenants to stop paying Beverly and to obtain the ground lease improvements.

Additionally, Saul filed a quitclaim deed purporting to vest in itself title to the shopping center. The deed was signed February 24 by Mr. Caraci, the officer in charge of real estate operations, and recorded three days later, after Beverly, through its new managing partner, BP Partners, had contacted Saul and advised that the partners were going to cure the rent default. On February 24 Saul also filed a declaratory judgment action in state court, seeking adjudication that the Ground Lease had terminated and title to the shopping center had vested in Saul. The suit was authorized by Mr. Caraci and Mr. Spillman, another Saul officer working on the Beverly matter. The complaint named as defendants both Beverly and Kroh. Kroh was named as a defendant both individually and as Beverly's general partner.

On February 13, 11 days before the state court action and quitclaim deed were filed, Kroh filed a Chapter 11 case. Mr. Caraci at Saul knew of Kroh's bankruptcy by February 19, but nevertheless he proceeded on February 24 to file the state court action and record the quitclaim deed. Messrs. Caraci and Spillman are lawyers with extensive experience in sophisticated commercial and real estate matters. Mr. Spillman also engaged in bankruptcy practice for several years before becoming an officer of Saul. These individuals knew Saul's actions, under their direction, violated the automatic stay in the Kroh bankruptcy, especially as to commencing a judicial proceeding against Kroh in its individual capacity. Upon review of the petition, including the prayer for relief, the Court does not find persuasive the argument that Kroh was inadvertently joined as an individual. It appears from the prayer that Saul intended to terminate the rights of any party, including Kroh, which claimed any legal or equitable interest in the shopping center.

Saul alleges it made some tax, insurance and mortgage payments. The amount and time of any payment was not the subject of specific testimony. Saul failed to bill Beverly for the payments pursuant to Lease Section 13.01. Beverly argues the payments were made in an effort to improve Saul's weak claim to the shopping center. However, the Court makes no finding in that regard.

### F. Beverly's Efforts To Regain Control

By January 1987, Beverly's equity investors learned of Kroh's impending demise. In order to regain control of the partnership the equity investors formed Beverly Plaza Partners, Inc. ("BP Partners") on January 12. BP Partners replaced Kroh as Beverly's managing general partner and exercised management control over Beverly starting in February.[1]

On February 24 BP Partners' president discovered the January 29 default notice. He immediately acted to cure the default. He contacted Mr. Hunt at Kroh, hired counsel, and began efforts to contact Saul. On February 26 he spoke to Mr. Spillman at Saul, explained Kroh's situation and said the partners wanted to cure the default. On March 2, Beverly's attorney tendered $34,769 for rent for November 1986 through February 1987, plus late charges computed pursuant to the Ground Lease.

---

1. Kroh and BP Partners entered a Partnership Control Agreement on February 5 by which BP Partners replaced Kroh as managing partner. Addition of BP Partners did not constitute a transfer of Beverly's controlling interest under Lease Section 10.11 because Beverly's equity owners did not change. Therefore, the lease did not require Saul's consent to addition of BP Partners as managing general partner.

Beverly's tender was offered without knowledge that Kroh had sent a one-month payment in February. Thus, the tender was a $6,779 overpayment.

The letter transmitting the tender itemized defects in the notice, so Saul was expressly notified of defects. Nevertheless, Saul refused the tender, stating the Ground Lease had already terminated. At trial Saul contended it refused the tender because it purported to cure all defaults and other defaults might have existed. However, Saul's February 10 internal memorandum stated that no other defaults existed. Instead of accepting the tender, Saul continued contacting tenants to demand that rent be paid to Saul as owner of the center. These acts were directed by persons who had been expressly notified of fatal defects in the notice which constituted the basis for their acts. They also knew or should have known that Beverly, as lessee in possession of premises, enjoyed substantial legal and equitable rights notwithstanding temporary failure to satisfy obligations under the 14-year old ground lease. Thus, Saul's actions were taken with knowledge of the substantial equity that existed in the shopping center, equity which would go to Saul if the Lease were terminated.

After Saul rejected Beverly's tender of the payment to cure the default in the Ground Lease, Beverly followed the lead of its general partner Kroh, and in April, 1987, Beverly filed a Chapter 11 bankruptcy. In protecting itself against attempted termination of the Ground Lease and loss of the shopping center, Beverly has been forced to incur substantial legal fees on the bankruptcy case, and Saul's motion to declare the automatic stay inapplicable or, in the alternative, to terminate the stay. In a post-trial affidavit, submitted without objection, Beverly's attorney states that fees incurred in connection with Saul matters were at least $67,002. The Court may take notice of items in its own files. In Beverly's main bankruptcy file, No. 87–01631–1–11, on February 17, 1988, Beverly's attorney filed a fee application requesting approval of fees and expenses totaling $73,793.66. The services in the itemized application pertain to bankruptcy and Saul-related matters. By Order entered March 14, 1988, the Court approved the application for attorney fees and expenses totaling $73,156.85.

## II. CONCLUSIONS OF LAW

Jurisdiction over this core proceeding is under 28 U.S.C. §§ 1334, 157(b)(2); venue is proper under 28 U.S.C. §§ 1408, 1409.

### A. Automatic Stay and Lift Of Stay

 Filing a bankruptcy petition operates as a stay of commencement or continuation of a judicial action against a debtor that was or could have been commenced before filing of the bankruptcy case. 11 U.S.C. § 362(a)(1). Saul contends the automatic stay is inapplicable to its complaint for declaratory relief filed in Wyoming state court on February 24 before Beverly filed bankruptcy. The action seeks determination that the Ground Lease terminated and to quiet title in favor of Saul. Saul argues it should be free to proceed against Beverly in state court because the lease terminated before Beverly filed bankruptcy. For reasons stated below, the lease was not properly terminated and therefore, Beverly had an interest in the property when it filed bankruptcy. Accordingly, the stay does apply to the declaratory judgment action and those proceedings cannot be continued without a lift of the stay by this Court. No evidence of Beverly's monthly debt service to Saul was presented at trial. Because the property, Beverly's sole asset, is necessary to reorganization and Beverly has equity of $4,000,000 in the property, Saul's motion to lift the automatic stay is denied.

### B. Termination of Ground Lease

It is well-settled that the law abhors forfeitures, especially where valuable tenant improvements, such as a shopping center, are at stake: "The bankruptcy code does not look with favor upon forfeiture clauses in leases. They are liberally construed in favor of the bankrupt lessee so as not to deprive the estate of property which may

turn out to be a valuable lease." *Finn v. Meighan*, 325 U.S. 300, 301, 65 S.Ct. 1147, 1149, 89 L.Ed. 1624 (1945). Wyoming law disfavors forfeitures:

> It is now well established in law and in equity that forfeitures are not favored. Before one can declare a forfeiture it must appear that he has a clear right and then too he himself must be free from blame.... Every reasonable presumption is against a forfeiture and every intendment and presumption is against a person seeking to enforce it. (citation omitted). 'Provisions for forfeiture may be waived and courts are quick to take advantage of circumstances indicating such an intention.' (citation omitted). And, 'So where the time fixed by the contract for performance is permitted to pass, both parties concurring, the time of performance thereafter becomes indefinite, and one party cannot rescind until full notice and a reasonable time for performance is given.' (citation omitted).
>
> \* \* \* \* \* \*
>
> In line with ... other courts, this court has taken the opportunity to say that, 'Forfeitures are not favored and ... slight evidence of the lessor's intention to relinquish his right is sufficient to warrant the finding of waiver.' (citation omitted).

*Baker v. Jones*, 69 Wyo. 314, 240 P.2d 1165, 1171[6–7] (1952), *cited with approval in Walker v. Graham*, 706 P.2d 278, 281 (Wyo.1985) *and Angus Hunt Ranch, Inc. v. Reb, Inc.*, 577 P.2d 645, 650 (Wyo.1978); *May v. Shields*, 393 P.2d 319, 324 (Wyo. 1964).

██ A party seeking forfeiture must strictly comply with procedures in the lease. "If the lease clause specifies the method of election, precise conformance will be required; minor deviations have often nullified attempts to terminate." Schoshinski, American Law of Landlord and Tenant § 6:1, at 381 (1980); *accord*, 51C C.J.S. *Landlord and Tenant* § 102, at 332. The forfeiture provision must be strictly construed against the lessor and liberally in favor of the lessee. *Id.* If a lease does not specifically waive common law prerequisites to forfeiture, compliance with lease procedures alone will not suffice; common law requirements must be satisfied as well. *Francam*, 646 P.2d at 348, *citing* 3A G. Thompson *Real Property*, § 1336; *Boyd*, 676 S.W.2d at 27 (Mo. App.1984); *Angus Hunt Ranch v. Bowen*, 571 P.2d 974, 978[6] (Wyo.1977). Wyoming law requires a reasonable time to cure and 11 days was not reasonable. *Baker*, 240 P.2d at 1171. Also, demand for the rent was not made on the date due as required by common law. *See Boyd*, 676 S.W.2d at 27; *accord, Angus Hunt Ranch*, 571 P.2d at 978; 3A Thompson, *Real Property* § 1336, at 610 (1981).

██ In this case, the equities strongly favor the tenant. Beverly owned valuable improvements. It failed to pay three months' rent during a brief period in which its managing partner was experiencing internal difficulties. The tenant reacted swiftly and responsibly to this unforeseeable development, admitting a new managing partner which promptly tendered all sums due.

In contrast, Saul seeks a windfall. It failed to comply with its own contract terms concerning default notice and termination. It sent to a partner with interests in many limited partnerships, whose business was in chaos, a defective, ambiguous default notice that was actively misleading as to the identity of the tenant, the cure period and the termination date. Under these circumstances, Wyoming law requires full notice and a reasonable time to cure. Beverly had only 11 days by the terms of the notice. Under the terms of the Lease and Wyoming common law, the period to cure was insufficient. Saul stood to gain a great windfall, a profitable and valuable tenant improvement with equity of $4 million, upon termination of the Ground Lease for failure to pay $20,337 rent. Given the equities, the default notice must be examined with exacting scrutiny. It fails to pass that examination. The defective notice was incapable of terminating the Ground Lease. The Ground Lease is in full force and effect with Beverly as tenant

and owner in fee simple of the shopping center.

### C. Turnover Of Property

 Under 11 U.S.C. § 542(a), an entity in possession of property of the debtor's estate may be ordered to deliver that property to the trustee. Saul is in possession of $19,649.75 in rent it wrongfully collected from Beverly's tenants. The rents are property of the estate and must be turned over to Beverly.

 Beverly is entitled to prejudgment interest on the diverted rents. Wyoming allows prejudgment interest on a liquidated claim which is "readily computable by simple mathematical computation." *Rissler & McMurray Co. v. Atlantic Richfield Co.*, 559 P.2d 25, 31[11] (Wyo.1977); *Belle Fourche Pipeline Co. v. Elmore Livestock Co.*, 669 P.2d 505, 515, n. 8 (Wyo.1983). Prejudgment interest is calculated from March 2, 1987, the date Saul was put on notice of defects in the default notice and the approximate date the rents were withheld. Cases have construed several Wyoming statutes to provide that in the absence of a contractual rate, prejudgment interest is seven percent. *See Holst v. Guynn*, 696 P.2d 632, 635[7] (Wyo.1985), *citing Rissler & McMurry Company*, 559 P.2d at 31–35. At $3.77 per diem on rents of $19,649.75, prejudgment interest for 550 days totals $2,073.50 [2]

### D. Breach Of Contract

By entering into the Ground Lease Saul covenanted that the lessee would have the right to enjoy the demised premises without hindrance by Saul. Saul breached the covenant of quiet enjoyment by its actions. As a result of Saul's conduct, Beverly has been deprived of $19,649.75 in rents. Prejudgment interest is awarded as described above.

### E. Tortious Interference With Contracts

 A party who, without privilege to do so, induces or otherwise purposely causes a third person or entity not to perform a contract with another is liable in tort for the harm caused. Restatement of Torts § 766 (1939). Under Wyoming law, there are four elements for tortious interference with a contract:

1) existence of a valid contractual relationship or business expectancy;

2) knowledge of the relationship or expectancy on the part of the interferer;

3) intentional interference inducing or causing breach or termination of the relationship or expectancy; and

4) resultant damage to the party whose relationship or expectancy has been disrupted.

*Toltec Watershed Improvement Dist. v. Johnston*, 717 P.2d 808, 813 (Wyo.1986), *citing Trustees of Weston County School Dist. v. Holso*, 584 P.2d 1009, 1016–17 (Wyo.1978).

 Here, the elements are easily met. First, Beverly had contractual relationships and a valid business expectancy that tenants would pay rent. Even under Saul's argument that the default notice was valid, the Ground Lease could not have terminated until February 17. Thus, on February 13, when Saul began demanding that tenants pay rent to Saul, the Ground Lease was still in effect. Moreover, after the tender and letter from Beverly, which expressly notified Saul of fatal defects in the notice, Saul continued contacting tenants. Second, Saul clearly knew of the leases between Beverly and its tenants. Third, Saul's actions to compel tenants to pay Saul were done for the sole purpose of diverting Beverly's rentals and ousting Beverly from possession. Saul purposely and without privilege caused tenants to stop paying Beverly, in breach of the lease agreements. Fourth, tenants stopped paying Beverly and in turn, Saul collected $19,649.75 from them.

 The following factors should be considered in determining whether the ac-

---

**2.** Post-judgment interest will accrue at the Wyoming legal rate of 10 percent per annum. Section 1–16–102, W.S. 1977; *Holst*, 696 P.2d at 636.

tor's conduct in intentionally interfering with a contractual relation is improper:

 a) the nature of the actor's conduct;

 b) the actor's motive;

 c) the interests of the other with which the actor's conduct interferes;

 d) the interests sought to be advanced by the actor;

 e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other;

 f) the proximity or remoteness of the actor's conduct to the interference; and

 g) the relations between the parties.

Restatement (Second) of Torts § 766 (1979); *Toltec*, 717 P.2d at 814.

Applying these factors to the present case the Court finds the following. The conduct was wrongful and in violation of both the Lease and common law. As to the actor's wrongful motive, the interests to be advanced by the actor, and the interests of Beverly which were interfered with, the acts were done in an attempt to appropriate tenant rents and a $4 million property for a $20,377 default. As to the relationship between the parties, they had been in a lessor/lessee relationship for 10 years during which Beverly had paid all payments owed to Saul. Under the Lease Saul was obligated to provide notice of certain matters so Beverly could protect itself from just the type of situation that occurred here—termination of the ground lease and loss of a valuable improvement for a default which was exceedingly minor compared to the value of the asset which would be lost. Finally, there is no social interest here to protect Saul's "freedom of action" to violate its Lease provisions and misappropriate a valuable leasehold improvement. Thus, application of these factors reinforce the conclusion that Saul's interference with Beverly's tenant leases was tortious and malicious.

■ If the interfering party acted in legitimate exercise of its rights, it is not liable for tortious interference with a contract. *Toltec*, 717 P.2d at 814, *citing Wartensleben v. Willey*, 415 P.2d 613, 614 (Wyo.1966). Saul did not legitimately exercise any right to terminate the Ground Lease. The Court concludes Saul tortiously interfered with contractual relationships between Beverly and its shopping center tenants. Damages caused by Saul's actions include $19,649.75 in wrongfully diverted rent payments, plus prejudgment interest as described above. Other tenants stopped paying rent altogether after being contacted by Saul, but no evidence was offered as to specific amounts of unpaid rents, so damages are not awarded for those losses. For the following reasons, attorney fees will also be awarded as actual damages.

■ Generally, attorney fees incurred in prosecuting the tortious interference action itself are not recoverable as actual damages. However, legal expenses are recoverable if incurred because the plaintiff had to engage in other litigation, apart from the tortious interference action, in order to protect its interests as a result of the interference. In other words, plaintiffs can recover legal expenses incurred in collateral litigation which was necessitated by defendant's tortious interference. Restatement (Second) of Torts § 914 (1979); *Feldmesser v. Lemberger*, 101 N.J.L. 184, 127 A. 815[2] (1925). Under Wyoming law attorney fees from prior litigation are recoverable as actual damages if they were the natural and proximate result of defendant's actions. *Hoiness–LaBar Insurance v. Julien Construction Company*, 743 P.2d 1262, 1273[12] (Wyo.1987); *accord, Kvenild v. Taylor*, 594 P.2d 972, 977–978[5] (Wyo.1979).

■ Here, as a result of Saul's tortious interference, Beverly was forced to file a Chapter 11 case in order to protect its interests and prevent loss of the leasehold and improvements. The bankruptcy case is analogous to a collateral action as referenced in the Restatement. It is not the same litigation as the tortious interference claim between Beverly and Saul but a separate judicial proceeding involving not only Saul but all other creditors as well, and was a natural and proximate result of Saul's tortious interference with Beverly's relations with tenants. Thus, fees incurred

in the bankruptcy proceeding may be included as actual damages. Legal expenses incurred in the bankruptcy case cover all types of bankruptcy work, including work on several aspects of the Saul matters. Although work on Saul's matters included some relevant to the tortious interference action, it overlapped with work on other matters in the bankruptcy, including general bankruptcy matters, defense of Saul's motion to declare the stay inapplicable or to terminate the stay. Although the fees may not be included as damages on the tortious interference count, they are allowable as actual damages resulting from Saul's conduct. For these reasons Beverly will also be awarded attorney fees in the amount of $73,156.85 as damages proximately caused by Saul's tortious interference with Beverly's leases. Alternatively, the Court finds the attorney fees may be awarded pursuant to 11 U.S.C. 362(h) for Saul's willful violation of the automatic stay by filing the declaratory judgment action against Kroh, as discussed at a later point.

*F. Punitive Damages For Tortious Interference With Contracts*

■ For imposition of punitive damages, Beverly alleges Saul's tortious interference with Beverly's contracts with its tenants, and violation of the automatic stay in Kroh's bankruptcy by filing the state court declaratory judgment action and recording the quitclaim deed after Kroh filed bankruptcy. The Court's conclusion that punitive damages should be awarded is based on Saul's tortious interference with Beverly's leases. Discussion of violation of the automatic stay by filing the declaratory judgment action is included as an alternative basis for the award of both attorney fees and punitive damages. The first two reasons support imposition of punitive damages, so it is not necessary to address violation of the stay by filing the deed.

■ Independent of the automatic stay provisions, a bankruptcy court may award punitive damages in accordance with common law. *First Arlington Nat'l Bank v. Barney's Boats of Chicago, Inc.*, 616 F.2d 164, 167 (5th Cir.1980); *In re Criswell*, 52 B.R. 184, 206 (Bankr.E.D.Va.1985). Punitive damages may be awarded "for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others," Restatement (Second) of Torts § 908(2) (1979), and "for the purpose of punishing the wrongdoer and as an example and deterrent to others engaging in similar conduct in the future." *Northern v. McGraw–Edison Co.*, 542 F.2d 1336, 1349 (8th Cir.), *cert. den.* 429 U.S. 1097, 97 S.Ct. 1115, 51 L.Ed.2d 544 (1976). Specifically, punitive damages may be awarded for tortious interference with contractual relations. *Hayes v. Irwin*, 541 F.Supp. 397, 439 (N.D.Ga.1982).

Wyoming law allows punitive damages where there has been "aggravated disregard of another's rights and where imposition of punitive damages will tend to prevent this type of violation in the future." *Sears v. Summit, Inc.*, 616 P.2d 765, 770 (Wyo.1980); *Adel v. Parkhurst*, 681 P.2d 886, 891 (Wyo.1984). The conduct must have been reckless, wanton, willful or malicious. *United States v. Redland*, 695 P.2d 1031, 1039 (Wyo.1985). "Actual malice requires a showing of actual ill will or hatred," but legal malice can also be grounds for punitive damages. Legal malice requires a showing of "wrongful or illegal conduct committed or continued with a willful or reckless disregard of another's rights." *Sears*, 616 P.2d at 770, *citing McCarthy v. J.P. Cullen & Son Corp.*, 199 N.W.2d 362, 369 (Iowa 1972).

■ Factors to consider in awarding punitive damages are the nature of the tort, the amount of actual damages and the defendant's wealth. *Sears*, 616 P.2d at 772[7]. Legal expense incurred in the present suit or other suits is also appropriately considered in determining punitive damages. Restatement (Second) of Torts § 908 comment e, § 914 comment a (1979).

Saul's conduct warrants imposition of punitive damages. Saul's officers, who were experienced commercial lawyers, acted with conscious disregard to Beverly's rights. The officers continued their efforts to seize rents and the shopping center even after being expressly informed of obviously

fatal defects in the default notice. They acted with knowledge that their conduct was wrongful because the lease had not been effectively terminated. In addition, their conduct included actions that were in knowing violation of the automatic stay in the bankruptcy case of Kroh, Beverly's general partner.

Saul knew the harm it was causing Beverly. Saul acted wantonly, willfully, intentionally, with full knowledge of the circumstances, and with the intent to appropriate Beverly's property when it performed each act in its course of conduct, including acts to stop Beverly's tenants from paying Beverly before termination of the ground lease. The efforts to misappropriate Beverly's property regardless of consequences to Beverly meets, at the very least, the definition of legal malice, which is wrongful or illegal conduct committed in knowing, willful disregard of Beverly's rights.

It is of utmost significance that Saul was given the opportunity to stop its course of action and act responsibly. Yet Saul continued taking rent payments, refused the overpaid tender, and plowed on with the deed and lawsuit, even when it knew that Kroh had filed bankruptcy and that the default notice had fatal defects and did not comply with Article 12 of the Lease. Saul persisted in its course of conduct, thus forcing Beverly into bankruptcy. It is an especially serious consideration that Beverly was forced into bankruptcy to protect itself from Saul. Due to the stigma of bankruptcy and the delay inherent in the process, filing inevitably has a deleterious effect on business operations and reputation.

■ Beverly had been a good lessee. But for the sudden problems of its general partner Kroh, Beverly would not have missed the payments. Saul sought to take advantage of Kroh's situation. Thus, Beverly, which had profitable tenant leases and a valuable shopping center, was dragged under. Saul persisted in its actions in order to reap a windfall of the $4 million equity in the shopping center which would revert to Saul if the lease could be quickly terminated for failure to pay $20,337.

The Court concludes that Beverly should be awarded punitive damages of $140,000, which is approximately 1.5 times the amount of actual damages. The award takes into account Saul's financial condition and national stature; the amount necessary for a deterrent effect on such a large, prominent entity as Saul (and others in the same business); the character of the wrongful action; the high degree of malice involved; the confusion and disruption at the shopping center caused by the actions; and the enormity of the wrong done insofar as it has substantially affected Beverly's operations and forced Beverly into bankruptcy in order to protect its interests. As to financial condition and ability to pay punitive damages, Saul is nationally prominent in commercial real estate, owning approximately 100 large commercial properties. Punitive damages of $140,000 are a minuscule portion of Saul's net worth. Further, over the course of the ground lease Saul's financial benefits have been substantial.

### G. Alternative Award: Punitive Damages For Violation Of Stay

In addition to awarding attorney fees and punitive damages for tortious interference with Beverly's leases, the Court also makes the alternative finding that attorney fees and punitive damages would be appropriate under 11 U.S.C. § 362(h) because Saul willfully violated the automatic stay under § 362(a)(1) in Kroh's bankruptcy case by filing the declaratory judgment action against Kroh—both individually and in Kroh's capacity as Beverly's general partner—after Kroh had filed bankruptcy. The sequence of events was: (1) on February 13, Kroh filed a Chapter 11 bankruptcy; (2) between February 24—27, Saul recorded a quitclaim deed to the shopping center and filed an action for declaratory judgment to quiet title to the shopping center, naming as defendants Beverly and Kroh, and (3) in April, after the tender to cure the default was rejected in March, Beverly filed a Chapter 11 case.

Section 362(h) provides that an individual injured by any willful violation of a stay

"shall recover actual damages, including costs and attorney fees ... and, in appropriate circumstances, may recover punitive damages." As held earlier, the automatic stay in Beverly's case prohibited Saul from continuing against Beverly with the declaratory judgment action in state court, and no pleadings were filed or served on Beverly after it commenced its bankruptcy. Beverly does not contend Saul violated the stay in Beverly's bankruptcy case. Rather, Beverly asserts that because Saul knew Beverly's general partner, Kroh, was in bankruptcy, and the action was filed after Kroh filed bankruptcy, the automatic stay was willfully violated in Kroh's case and the violation injured Beverly.

 The debtor in whose case the violation of stay occurred is not the only party who can seek damages under § 362(h). The statute states "an individual" injured by willful violation of the stay may seek damages.[3] As a creditor of Kroh,[4] and a party whose interest in the partnership property would be affected by the judicial proceeding against its general partner, Beverly is "an individual" with standing to raise the issue. In support of this conclusion, the Court relies on the exhaustive analysis of the issue of a creditor's standing under § 362(h) in *Matter of Reserves Development Corp.,* 64 B.R. 694, 699 (W.D.Mo.1986).

Normally, the party claiming standing under § 362 maintains its action in the bankruptcy case of the debtor against whom the stay was violated. The procedural posture is unusual here because Beverly is not asserting its standing in Kroh's case, but rather in Beverly's own bankruptcy case. However, Saul joined Kroh as a defendant in its counterclaim, and the matters pending among all these parties were consolidated for trial. While the situation is novel, the Court concludes it is appropriate for Beverly to join its claim for damages under § 362(h) with its other claims against Saul in this adversary action in Beverly's bankruptcy proceeding:

Beverly's claim that it was injured by violation of the stay in Kroh's bankruptcy is valid. First, in Kroh's bankruptcy proceeding, the automatic stay imposed by § 362(a)(1) was violated when Saul filed the declaratory judgment action naming Kroh as a defendant on February 24, after Kroh filed its Chapter 11 case on February 13.[5]

Second, the violation was willful, with knowledge of the bankruptcy and in conscious disregard of the stay. Even though Mr. Caraci knew of Kroh's bankruptcy by February 19, five days later he filed the state court action. Saul's officers in charge of the lease termination, Messrs. Caraci and Spillman, are lawyers with extensive experience in commercial and real estate matters, and Mr. Spillman engaged in bankruptcy practice before becoming an officer of Saul. These officers knew Saul's actions, under their direction, violated the

---

3. "Individual" under § 362(h) includes corporations and other like entities. *See Budget Service Co. v. Better Homes of Virginia,* 804 F.2d 289, 292[5] (4th Cir.1986).

4. *See* Proofs of Claim Nos. 496 and 497 filed by Beverly, the Schedules and the Statements of Affairs in *In re Kroh Brothers Development Co.,* Case No. 87–00640–1–11 (W.D.Mo.).

5. The present case under § 362(a)(1) is distinguishable from *Matter of Minton Group, Inc.,* 46 B.R. 222, 225[6–7] (S.D.N.Y.1985), which held that recording a year-old mortgage on partnership property after its general partner filed bankruptcy did not violate the stay against acts to create liens on property of the estate under § 362(a)(4). The court held the stay did not apply to debtor general partner's interest in partnership property because the general partner exercised too few rights in the property. However, *Minton* noted that "it cannot be said that [debtor has] no property interest in the real estate." 46 B.R. at 225[6]. In this case, rather than merely recording a mortgage, Saul filed a quiet title action against Kroh. Commencement of the judicial proceeding violated § 362(a)(1). The violation of the stay here is against Kroh, not merely against partnership property. Even under the *Minton* rationale Kroh's case is distinguishable because the quiet title action and quitclaim deed had a more significant effect on Kroh's partnership interest in the partnership's property than the mortgage filed in *Minton.* Kroh exercised sufficient rights in the property so that its property interest was protected by the automatic stay, especially since Saul was seeking to appropriate the partnership's sole asset which would, in turn, render Kroh's partnership interest and its equitable interests in the partnership's asset worthless.

stay. Given Saul's conscious disregard of the automatic stay when it filed the action, Saul's conduct was willful.

Third, Beverly was injured by Saul's willful conduct because Saul's action against Kroh affected Beverly's interest in the partnership's sole asset, the shopping center and Ground Lease. Beverly was injured in two capacities: first, as a partnership; and second, as a creditor of Kroh, where Kroh's interest in the partnership was being rendered valueless. See *Reserves Development*, 64 B.R. at 699.

One could also argue that Saul's violation of the stay by naming Kroh as a defendant injured Beverly because Kroh was an indispensable party. If Saul was stayed from suing an indispensable party, it could not proceed against Beverly either, even though Beverly had not yet filed bankruptcy. Thus, disregard of the stay in Kroh's bankruptcy case injured Beverly.

The action sought a declaratory judgment that the Ground Lease had terminated. When declaratory relief is sought under Wyoming law, "all persons shall be made parties who have or claim any interest which would be affected by the declaration." WYO.STAT § 1–37–113 (1977). The statute is not mandatory in actions involving personal judgments, but it may be construed as mandatory in proceedings in rem. *See Holly Sugar Corp. v. Fritzler*, 42 Wyo. 446, 296 P. 206, 218 (1931). However, even if the statute is construed as permissive, Kroh was an indispensable party to the action.

A party is indispensable under Wyoming law if the answer is "no" to any of the following four considerations: 1) whether the interest of the absent party is distinct and severable; 2) whether, in the absence of such party, the court can render justice among the parties before it; 3) whether the decree made in the absence of a party will have an injurious effect on the interest of the absent party; and 4) whether the final determination, in the absence of such party, will be consistent with equity and good conscience. *American Beryllium & Oil Corp. v. Chase*, 425 P.2d 66, 68[1] (Wyo. 1967), *quoting Photometric Products Corp. v. Radtke*, 17 F.R.D. 103, 109 (S.D.N.Y.1954).[6]

■ A judgment terminating the lease and quieting title to the shopping center in Saul would clearly have an injurious impact on the value of Kroh's partnership interest in Beverly. The shopping center is Beverly's sole asset, so such a decision would render Kroh's partnership interest worthless. Kroh, therefore, was an indispensable party to the quiet title action in Wyoming. Because Kroh was indispensable, Wyoming law requires that Kroh be joined in the declaratory judgment action concerning the shopping center. Thus, Saul could not sue Beverly without also joining Kroh as a party.[7] If Saul was prohibited from suing Kroh due to the automatic stay, and without the indispensable party would have been prevented from suing Beverly, then Saul's commencement of the action against Kroh injured Beverly.

Strong action is merited when a creditor willfully violates the stay. "The automatic stay is one of the most significant provisions in the Code, giving the debtor immediate and absolute relief from creditors until the Court grants relief.... It is not to be nibbled at the edges." *In re Houts*, 23 B.R. 705, 708 (Bankr.W.D.Mo.1982). *Houts* awarded damages and attorney fees when a creditor filed a mechanic's lien suit without first getting the stay lifted. Even though the debtor was not served with process at creditor's request, mere filing of the action was held to violate § 362(a). See also *Fidelity Mortgage Investors v. Came-*

---

**6.** *American Beryllium*, in holding the party was not indispensable, noted the action was not one to quiet title, but was to obtain possession or to recover profits from the operator. 325 P.2d at 69[2].

**7.** Saul apparently followed this line of reasoning because it sued Kroh both as a general partner of Beverly and individually. Saul's assertion that Kroh was inadvertently joined as an individual is not persuasive. Upon review of the petition, it it appears from the prayer for relief that Saul intended to terminate the rights of any party, including Kroh, which claimed any legal or equitable interest in the shopping center.

*lia Builders, Inc.,* 550 F.2d 47 (2d Cir.1976) (creditor and its attorney were held in contempt for willful violation of stay and substantial penalty was imposed). Finally, application of § 362(h) is mandatory when a violation is willful: "An individual injured by any willful violation of a stay ... *shall* recover actual damages, including ... attorneys' fees."

The evidence supports damages under § 362(h). Accordingly, as an alternative determination of the damages awarded for tortious interference with contracts, the Court also finds the same damages may be awarded for willful violation of the stay which resulted in injury to Beverly. Beverly is awarded $73,156.85 in attorney fees and $140,000 in punitive damages.

*H. Saul's Counterclaims*

Saul's counterclaim seeks adjudication that the Ground Lease is terminated, the shopping center has reverted to Saul, and Beverly has interfered with Saul's rights by continuing to act as shopping center landlord. For the above reasons, the Court finds in favor of Beverly on these claims.

Saul also alleges Beverly breached the Ground Lease by failing to pay rent, mortgage, taxes and insurance. The allegations lack merit. Saul's internal memorandum (Defendant's Exhibit 27) states the only default was failure to pay the rent. As to rent, Beverly failed to pay three months' ground rent, but on March 2 it tendered the sums requested in the default notice, an additional month's rent and late charges. The tender was made under cover of letter correctly stating that Beverly's payment would cure the defaults outlined in Saul's default notice. The unconditional tender was valid, but Saul wrongfully rejected it. Where a "party has tendered to the other party an amount reflecting the entirety of its legal obligation, that obligation is fulfilled, and the other party cannot, by refusing such tender, reinstate that obligation." *Parker v. Unigard Ins. Co.,* 44 Ohio App.2d 199, 337 N.E.2d 181, 183 (1975); *accord, Hefner v. Hall,* 223 Ga. 148, 154 S.E.2d 197, 199 (1967). By tendering amounts owed, Beverly cured its rental defaults. Beverly cannot be held in breach of its covenant to pay rent to Saul.

However, Saul is entitled to a setoff of $27,990 for tendered sums that remain unpaid. 74 Am.Jur.2d *Tender* § 35 (1974). The setoff is calculated by subtracting $6,779 (the month's rent Kroh paid in February) from $34,769 (the four months' rent and late charges Beverly tendered on March 2). Payment was tendered, but rejected by Saul, so prejudgment interest is not appropriate.

As to tax, mortgage and insurance payments, the record fails to establish what payments were actually made by Saul. The record does establish, however, that any such payments were not billed to Beverly in accordance with Lease Section 13.-01, which requires Saul to send a bill to Beverly demanding payment before Saul can recover such payments. Under the circumstances, Saul will be held strictly to the lease provisions. Saul failed to meet its burden of proof.

## CONCLUSION

Saul is liable for the following actual damages: rents of $19,649.75, prejudgment interest of $2,073.50, and attorney fees of $73,156.85, for total actual damages of $94,880.10. In addition, judgment will be entered for punitive damages of $140,000. In turn, Saul is entitled to a setoff of $27,990 against the damages awarded to Beverly. In all other respects, judgment is entered in favor of Beverly and Kroh and against Saul on Saul's counterclaim. The Ground Lease is in full force and effect with title to improvements on the land in Beverly. The quitclaim deed is void and of no effect. Saul is ordered to reconvey the property to Beverly and to record this judgment with the real estate records. Accordingly, Saul's motion to declare the automatic stay inapplicable or to terminate it is denied, and Saul is ordered to dismiss the state court quiet title action.

Accordingly, on plaintiff's First Amended Complaint and defendant's counterclaim, it is hereby ORDERED, ADJUDGED AND DECREED as follows:

1. Counts V, VI and VII are dismissed as moot and withdrawn by Beverly.

2. On Counts I and II, judgment is entered for Beverly and against Saul, declaring that the Ground Lease is in full force and effect with Saul as landlord and Beverly as tenant, and that title to improvements on the land is quieted in Beverly. Saul is directed to execute a quitclaim deed conveying the property back to Beverly, and to record that quitclaim deed and a copy of this judgment, all within five days after the judgment herein becomes final.

3. On Counts III, IV, VIII and IX, judgment is entered for Beverly and against Saul for $94,880.10 in actual damages and $140,000 in punitive damages, plus post-judgment interest at the rate of 10 percent per annum and all costs of the case.

4. As to Saul's counterclaim, Saul is allowed a setoff of $27,990.00 against the money judgment entered for Beverly. In all other respects, judgment on the counterclaim is entered for Beverly and Kroh and against Saul.

5. Saul's motion to declare the automatic stay inapplicable or to terminate the stay is denied, and Saul shall dismiss the state court action within five days after this judgment becomes final.