978 F.2d 1493
 LATHAM SEED COMPANY; the Ohio Grain Company, formerly doing
business as Ohio Soil Service, Inc.; Schettler Seed Farm,
Inc., doing business as Diamond Brand Seeds; Rupp Seeds,
Inc.; Shockney Seed Service, Inc.; Diener Bros., Inc.;
Charles O. Laverty, doing business as Laverty Seed Farm;
Coomer Seeds, Inc.; Settlemyre Seed Co.; St. Joseph Valley
Seed Co., doing business as M.F.I. Seeds, Appellees,
v.
NICKERSON AMERICAN PLANT BREEDERS, INC., doing business as
Agripro Seeds, Appellant.
LATHAM SEED COMPANY; the Ohio Grain Company, formerly doing
business as Ohio Soil Service, Inc.; Schettler Seed Farm,
Inc., doing business as Diamond Brand Seeds; Rupp Seeds,
Inc.; Shockney Seed Service, Inc.; Diener Bros., Inc.;
Charles O. Laverty, doing business as Laverty Seed Farm;
Coomer Seeds, Inc.; Settlemyre Seed Co.; St. Joseph Valley
Seed Co., doing business as M.F.I. Seeds, Appellants,
v.
NICKERSON AMERICAN PLANT BREEDERS, INC., doing business as
Agripro Seeds, Appellee.
 Nos. 90-2486, 90-2550.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 4, 1991.
Decided Nov. 9, 1992.
Rehearing and Rehearing En Banc
Denied Dec. 22, 1992.
 
 W. Dennis Cross, Kansas City, Mo., argued (Leonard J. Johnson and Don Kersten, on brief), for appellants.
 James L. Kramer, Fort Dodge, Iowa, argued (William S. Gibb and Arthur H. Johnson, on brief), for appellee.
 Before LAY,* Chief Judge, WOLLMAN, Circuit Judge, and RONEY,** Circuit Judge.
 WOLLMAN, Circuit Judge.
 
 
 1
 Nickerson American Plant Breeders, Inc. (Nickerson) appeals from the judgment entered by the district court[1] on a verdict against it for fraud and breach of oral contract and for punitive damages. One of the plaintiffs, St. Joseph Valley Seed Company, cross-appeals the denial of prejudgment interest on its exemplary damages award. We affirm the judgment and the punitive damages award and reverse the denial of prejudgment interest.
 
 I.
 
 2
 Agripro, Inc. developed and patented varieties of soybean seeds. It distributed its seed through an "associate" system, in which Agripro sold seed stock to seed companies (the associates), which in turn grew and processed the stock into commercial seed for sale to seed dealers. The dealers then sold that seed to farmers. The associates paid royalties to Agripro on their sales of commercial seed.
 
 
 3
 Nickerson purchased Agripro in 1976 and continued the associate system of distribution, using the Agripro name. Nickerson's business director, L.C. Nelson (later its president),[2] visited each associate and assured it that the system would continue as before. Other Nickerson officials assured the associates over the years that the system would continue as before. Nickerson's Statement of Agripro Associate Policies stated that Nickerson would "keep the associates informed on all matters relevant to the Associate program."
 
 
 4
 In 1982, Nickerson entered into new three-year contracts with the associates. These contracts gave the associates the right to produce and market Nickerson's soybean varieties using the Agripro name. Each individual contract stated, however, that it gave the associate "no exclusive rights of any kind."
 
 
 5
 In 1983, Warren Melles became president of Nickerson. He reviewed the company's marketing and distribution strategy and in October recommended to the board of directors that Nickerson terminate the associate program and distribute soybean seed directly through seed dealers. The board approved this recommendation in March 1984, and Nickerson informed the associates of its decision that July. In 1985, Nickerson began selling commercial seed directly to seed dealers in competition with the associates, whose contracts extended through that year.
 
 
 6
 The plaintiffs--ten associates from Indiana, Michigan, Ohio, and Iowa--filed suit against Nickerson in the fall of 1985. Nickerson counterclaimed for royalties on the associates' 1985 seed sales. The jury awarded the plaintiffs compensatory damages in amounts ranging from $11,139 to $475,776 each, for a total of $1,095,740.[3] It found that Nickerson had fraudulently concealed its decision to discontinue the associate system and that Nickerson had breached oral contracts with the associates by selling Agripro seed in competition with them, by failing to disclose matters relevant to the associate program, and by failing to renew the contract of one associate, Coomer Seeds. The jury awarded $1 million in punitive damages to each of nine associates and $1 million in exemplary damages to St. Joseph Valley Seed Company and found against Nickerson on its counterclaim.
 
 
 7
 Nickerson appeals. St. Joseph Valley Seed Company cross-appeals, claiming that the district court erroneously refused to award prejudgment interest on its exemplary damages award.
 
 II.
 
 8
 Nickerson raises several claims of error in disputing its liability for breach of contract and fraud. It claims first that it did not breach its contracts with the associates 1) by selling seed directly to seed dealers, because the contracts with the associates were non-exclusive, 2) by failing to inform the associates of termination of the program, because the contracts were of limited duration and had no notice requirement, or 3) by failing to renew Coomer Seeds' contract, because the contract expired by its own terms. Second, Nickerson claims that it did not commit fraud by failing to inform the associates of relevant matters, because it had no duty to disclose business decisions to the associates and because it did inform the associates that the program would be terminated. Last, Nickerson claims that the district court erred by denying its motion for directed verdict on its counterclaim for royalties.
 
 
 9
 Nickerson first argues that the contracts with the associates were of limited duration, had no notice requirement, expired by their own terms, and were unambiguously non-exclusive.
 
 
 10
 With respect to the provision of the contract stating that it gave the associate "no exclusive rights of any kind," several associates testified at trial that they understood this clause to refer only to geographical areas. That is, they believed that although only Agripro associates would be authorized to sell Agripro seed and that Nickerson could authorize others as associates, no associate had the right to exclude another from a territory. This testimony was bolstered by Nelson's testimony that the clause referred only to geographical exclusivity and that the associates would not have agreed to contracts containing clauses allowing non-associates to sell Agripro seed. Nelson further stated that the exclusivity clause replaced a clause that gave associates the "exclusive right to market" Agripro products. The original clause had been used by some associates to keep other associates out of particular geographic territories; Nickerson wanted to make clear that associates had no right to do so, and substituted the clause in question.
 
 
 11
 The contracts were silent as to integration. Nelson, who drafted the 1982 contract, testified that the contracts were not intended to be integrated on the issue of exclusivity. Nelson testified further that he intentionally avoided putting any language of integration into the marketing agreements for 1977, 1978, 1979, and 1982, "because no associate would sign it." Tr. at 942. Nelson stated that the associates would have refused to sign any contract containing an integration clause because "there would [have been] no validity then to all the promises I had made and other people in management had made to the associates...." Tr. at 943. Accordingly, the district court instructed the jury that, depending on its findings of fact, the agreements between Nickerson and the associates could consist of both written and oral agreements. We agree with the district court that the exclusivity language of the contracts does not preclude the jury's finding that a separate oral agreement existed that only associates could sell Agripro seed. Consequently, the district court did not err in submitting this issue to the jury.
 
 
 12
 We next turn to the question whether the jury could reasonably have found that there were additional oral contracts; that Nickerson had breached its contracts with the associates by selling seed in competition with them, concealing information relevant to the associate program, and not renewing Coomer Seeds' contract; that Nickerson had committed fraud; and that Nickerson's actions relieved the associates of their duty to pay royalties.
 
 
 13
 We will overturn a jury verdict "only where the evidence is susceptible to no reasonable inferences sustaining it." Cerro Gordo Charity v. Fireman's Fund Am. Life Ins. Co., 819 F.2d 1471, 1485 (8th Cir.1987) (quoting Cashman v. Allied Prod. Corp., 761 F.2d 1250, 1253 (8th Cir.1985)). We consider the evidence in the light most favorable to the verdict, giving the prevailing party the benefit of all reasonable inferences that can be drawn from the evidence and deciding factual disputes in favor of the verdict. Zoll v. Eastern Allamakee Community School Dist., 588 F.2d 246, 250 (8th Cir.1978).
 
 
 14
 Applying this deferential standard, we find that the evidence supports the jury's finding that oral agreements existed between Nickerson and the associates and that Nickerson had breached them. The associates and Nelson testified that the contract clause on exclusivity was changed to ensure that associates knew that they could not claim an exclusive territory. Letters from Nickerson to associates and to outsiders state that non-associates were not entitled to sell Agripro seed. Thus, the jury could reasonably have concluded that Nickerson breached its contract by selling soybean seed.
 
 
 15
 The agreement to keep the associates informed of matters relevant to the associate program was embodied in Nickerson's written policies. Even though Nickerson eventually revealed its plan to terminate the associate program, it did so long after the plan was adopted and after the 1984 planting had taken place. Thus, the jury reasonably found that Nickerson breached this agreement.
 
 
 16
 Plaintiff Coomer Seeds, an Indiana corporation, entered into its first contract with Nickerson in 1984, after Melles had recommended that the associate program be discontinued. Coomer Seeds was assured that its association with Nickerson was a "long-term thing" and that it could continue as an associate as long as it did a good job. Thus, the jury could reasonably have concluded that Nickerson had orally agreed to renew the Coomer Seeds contract.[4]
 
 
 17
 The evidence also supports the jury's finding that Nickerson had committed fraud. Nickerson signed a new associate contract with Coomer Seeds in April 1984, after the decision to terminate the associate program had been made. Termination of the associate program rendered the representations Nickerson had made to the associates over the years untrue. In addition, Nickerson encouraged the associates to order large amounts of seed stock in 1984, all the while knowing that it intended to terminate the program later that year.
 
 
 18
 Last, Nickerson contends that the district court erred by denying its motion for directed verdict on its counterclaim for royalties. The jury, however, found that Nickerson had breached material conditions of the contracts with the associates and that this breach relieved the associates of their obligation to pay royalties. Whether a party has failed to perform obligations of a contract is a question properly decided by a jury. See, e.g., Taylor Enter., Inc. v. Clarinda Prod. Credit Ass'n, 447 N.W.2d 113, 116 (Iowa 1989). Thus, the district court did not err in refusing to set aside the jury's finding against Nickerson on the counterclaim.
 
 III.
 
 19
 Nickerson also argues that the punitive damages awards against it must be set aside. It contends that the awards are defective on state law grounds and that they violate the due process requirements of the fourteenth amendment.
 
 
 20
 First, Nickerson claims that the trial court should have set aside the punitive damage awards because 1) there were no aggravating circumstances, 2) the jury was given no evidence of Nickerson's financial condition, 3) the jury was instructed that it should consider Nickerson's financial condition if it awarded punitive damages, but was given no evidence of Nickerson's finances, and 4) plaintiffs improperly referred to Nickerson's parent corporation during closing argument.
 
 
 21
 A jury must be properly instructed with respect to a state's laws. The law on punitive damages in Iowa, Indiana, and Ohio share a similar objective: to punish a defendant for certain conduct. See Iowa Code Ann. § 668A.1 (West 1992) (willful and wanton disregard for the rights of others); Ohio Rev.Code Ann. § 2315.21 (Anderson 1991) (malice, aggravated fraud, oppression, or insult); Powers v. Gastineau, 568 N.E.2d 1020, 1024-25 (Ind.Ct.App.1991) (malice, fraud, gross negligence, or oppression). The law in Michigan is somewhat different. There the purpose of exemplary damages is not to punish a defendant but to make the plaintiff whole for damages, not readily calculated, which are caused by malicious, willful, or wanton conduct, such as "feelings of humiliation, outrage and indignity." Veselenak v. Smith, 414 Mich. 567, 327 N.W.2d 261, 264 (1982). None of these states requires a plaintiff to prove a defendant's financial worth before it can recover punitive damages. See, e.g., Hibschman Pontiac, Inc. v. Batchelor, 266 Ind. 310, 362 N.E.2d 845, 849 (1977); Hall v. Montgomery Ward & Co., 252 N.W.2d 421, 425-26 (Iowa 1977); Peisner v. Detroit Free Press, 68 Mich.App. 360, 242 N.W.2d 775, 780 (1976). Having carefully examined the punitive damages instruction given to the jury and the laws of these four states, we find that the instruction adequately explained the law and that the jury properly followed the instruction.[5]
 
 
 22
 Nickerson complains that the jury was presented no evidence of Nickerson's financial condition. The district court's opinion notes that "[t]he court made it clear after plaintiffs had rested their case that it would be submitting the issue of punitive damages to the jury and defendant had the opportunity to introduce its net worth statement into evidence if it was concerned its relationship with the Royal Dutch/Shell organization would lead the jury to conclude its resources were greater than they were." Latham Seed Co. v. Nickerson American Plant Breeders, Inc., No. C85-3114, slip. op. at 12 (N.D.Iowa Oct. 3, 1991). Nickerson had the opportunity to introduce the evidence of whose lack it complains but refused to do so. Id., slip. op. at 13 n. 3. Consequently, we find this claim to be without merit.
 
 
 23
 Next, Nickerson challenges the punitive damages awards on the grounds that they are excessive in the light of Nickerson's net worth and that they are disproportionate to the compensatory awards. Because assessment of damages is within the jury's sound discretion, we will overturn the award only if it is a plain injustice or a monstrous or shocking result. Stafford v. Neurological Medicine, Inc., 811 F.2d 470, 475 (8th Cir.1987). The law of the states involved embodies this principle as well. Ryan v. Arneson, 422 N.W.2d 491, 496 (Iowa 1988) (an inflexible ratio that focuses on plaintiff's injury rather than on defendant's wrongdoing fails to accomplish the purpose of punitive damages); Schlitz Brewing Co. v. Central Beverage Co., 172 Ind.App. 81, 359 N.E.2d 566, 581 (1977) (to be excessive, a punitive damage award must be the result of passion or prejudice); Oppenhuizen v. Wennersten, 2 Mich.App. 288, 139 N.W.2d 765, 770 (1966) (exemplary damages must not be oppressive or shock the sense of fair-minded people); Villella v. Waikem Motors, Inc., 45 Ohio St.3d 36, 543 N.E.2d 464, 469 (1989) (low compensatory damages and high punitive damages assessed by a jury are not in and of themselves cause to reverse). The district court specifically found that the punitive damages awards were not so excessive that they shocked its conscience or reflected bias, passion, prejudice or corruption on the part of the jury.
 
 
 24
 "In reviewing an award of punitive damages, the role of the District Court is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered. The Court of Appeals should then review the District Court's determination under an abuse of discretion standard." Browning-Ferris Indus. v. Kelco Disposal, Inc., 492 U.S. 257, 279, 109 S.Ct. 2909, 2922, 106 L.Ed.2d 219 (1989). The district court considered Nickerson's objections that the award was excessive in relation to its net worth and disproportionate in relation to the actual damages awarded. The court found that although the jury had little information about Nickerson's net worth, Nickerson itself could have provided the information and failed to do so. Additionally, although each plaintiff recovered different amounts of actual damages and equal amounts of punitive damages, each plaintiff suffered from the same fraudulent conduct on Nickerson's part. The actual damages varied only because of the size of the associate. There is testimony in the record that Nickerson realized approximately $10 million from discontinuing the associate program.
 
 
 25
 In addition, the record is replete with examples of conduct on Nickerson's part that support the award of punitive damages. For example, Nickerson used various ruses to procure the associates' dealer lists to facilitate its undisclosed plan to recruit the associates' dealer customers. Nickerson asked its advertising manager, Chuck Stephens, to covertly check associate Schettler Seed Farm's dealer list, despite his ethical reservations. Nickerson management suggested that its salesmen obtain the dealer lists by offering to help boost associate sales through identifying their key dealers. One salesman, Charles Jackson, testified that he lied to obtain access to old advertisements containing dealer names. Another salesman, Russell Welty, expressed reservations about, as he put it, betraying the associates' trust by getting the dealer names. Welty's refusal to betray that trust was one of the reasons that gave rise to his being terminated by Nickerson. Taking all of this into account, we find no abuse of discretion in the district court's assessment that the punitive damages awards were not improper.
 
 
 26
 Nickerson also challenges the constitutionality of the punitive damages awards. We remanded this issue to the district court after the United States Supreme Court's decision in Pacific Mutual Life Insurance Company v. Haslip, --- U.S. ----, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), in which the Court outlined the due process requirements that must be satisfied as a prerequisite to the award of punitive damages. In Haslip, the Court refused to "draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case." Id., --- U.S. at ----, 111 S.Ct. at 1043. The Court's concern about punitive damage awards centered on unlimited jury discretion and "general concerns of reasonableness and adequate guidance from the court." Id.
 
 
 27
 The Supreme Court set forth three factors which convinced it that Alabama's procedures do not permit the jury to exercise unfettered discretion in awarding punitive damages. First, Alabama courts instruct juries regarding the purpose of punitive damages and explain that their imposition is not compulsory. Id., --- U.S. at ----, 111 S.Ct. at 1044. Second, Alabama trial courts are required to review punitive awards on the record under a seven-factor test set forth in Hammond v. City of Gadsen, 493 So.2d 1374, 1379 (Ala.Sup.Ct.1986). Id. Third, Alabama has a substantive review process that acts as a check on the jury's or trial court's discretion by determining whether punitive damages are reasonably related to the purposes of the award. Id. --- U.S. at ----, 111 S.Ct. at 1045.
 
 
 28
 The district court found that the punitive damages awarded to the plaintiffs in this case satisfy the requirements of due process delineated in Haslip. The jury instruction at issue is similar to the one given in Haslip. In Instruction 54, the district court carefully instructed the jury on the relevant law of each of the four states concerning the nature and purpose of punitive damages.[6] The court further instructed the jury that the imposition of punitive damages was discretionary and that it should consider the nature and harmfulness of Nickerson's conduct. Following our remand, the district court thoroughly reviewed the punitive damages awards under the standards of each of the four states. Each of the four states has very broad standards, which the district court found had been met. Though not required to do so by the law of any of the four states, the district court then carefully reviewed the punitive damage awards under the seven Hammond factors used by Alabama courts. Having completed its review, the district court found that the punitive damages awards were proper.
 
 
 29
 Nickerson argues that the district court's standard of review mirrors the statutory schemes of Mississippi and Vermont, about which some Justices expressed concern in Browning-Ferris Industries, 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989), and Bankers Life & Casualty Co. v. Crenshaw, 486 U.S. 71, 108 S.Ct. 1645, 100 L.Ed.2d 62 (1988). We cannot agree. First, we observe that the Supreme Court did not reverse, on due process grounds or otherwise, the award of punitive damages in either of those cases. Likewise, in Haslip the Court did not overrule either case, but merely distinguished the Vermont and Mississippi statutes as offering less protection than the Alabama scheme.
 
 
 30
 Nickerson errs in construing the Alabama process approved in Haslip as setting a minimum standard for acceptable due process in the awarding of punitive damages. See Glasscock v. Armstrong Cork Co., 946 F.2d 1085, 1098 (5th Cir.1991), cert. denied sub nom., Celotex Corp. v. Glasscock, --- U.S. ----, 112 S.Ct. 1778, 118 L.Ed.2d 435 (1992). See also Eichenseer v. Reserve Life Ins. Co., 934 F.2d 1377, 1384 (5th Cir.1991) (punitive damages five hundred times the amount of compensatory damages held to be reasonable and not violative of due process). Nickerson mistakenly seizes upon various fragments in the district court's opinion and asserts that the district court applied an overly malleable standard to satisfy the requirements of due process.
 
 
 31
 We reject Nickerson's contention that a "passion and prejudice" standard of review cannot satisfy constitutional due process requirements after Haslip. See Glasscock v. Armstrong Cork Co., 946 F.2d at 1098. We agree with Nickerson that Indiana, Ohio, Michigan, and Iowa have less stringent procedures for reviewing punitive damage awards than does Alabama. We cannot agree, however, that the difference results in a due process violation. Indeed, the district court's additional scrutiny of the award under the seven Haslip factors helps to ensure that the jury's verdict satisfied due process requirements. We find the district court's reasoning persuasive, and we affirm its conclusion that the award of punitive damages did not violate constitutional standards.[7]
 
 IV.
 
 32
 St. Joseph Valley Seed Company cross-appeals from the denial of prejudgment interest on its award of exemplary damages. Under Michigan law, "[i]nterest shall be allowed on a money judgment recovered in a civil action...." Mich.Comp.Laws Ann. § 600.6013 (West 1992). The district court denied St. Joseph Valley's motion for interest, stating that it had found no Michigan case that allowed prejudgment interest on exemplary damages.
 
 
 33
 We review a district court's determination of state law de novo. Salve Regina College v. Russell, --- U.S. ----, ----, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991). Here, we must decide whether the Michigan Supreme Court would treat an award of exemplary damages as a "money judgment."
 
 
 34
 The Michigan Supreme Court has said that section 600.6013 is a remedial statute and should be liberally interpreted. Denham v. Bedford, 407 Mich. 517, 287 N.W.2d 168, 171 (1980). The purpose of the statute is to "compensate the prevailing party for delay in receiving money damages." McCahill v. Commercial Union Ins. Co., 179 Mich.App. 761, 446 N.W.2d 579, 586 (1989).
 
 
 35
 The Michigan courts have defined the term "money judgment" as a judgment which "adjudges the payment of a sum of money, as distinguished from directing an act to be done." Department of Treasury v. Central Wayne County Sanitation Auth., 186 Mich.App. 58, 463 N.W.2d 120, 122 (1990). A treble damage award is a money judgment, Meehan v. Michigan Bell Tele. Co., 174 Mich.App. 538, 436 N.W.2d 711, 728 (1989); and a plaintiff may collect both prejudgment interest and a penalty interest award, McCahill, 446 N.W.2d at 587 (though here prejudgment interest, by statute, offset penalty interest). Moreover, in Goins v. Ford Motor Co., the court stated that section 600.6013 "applies to all damages sought and sustained in a civil action brought for the recovery of money damages." 131 Mich.App. 185, 347 N.W.2d 184, 192 (1983). On the strength of these cases, we believe that the Michigan Supreme Court would treat an exemplary damage award as a "money judgment."
 
 
 36
 Accordingly, we affirm that portion of the judgment which awards compensatory and punitive damages, reverse that portion of the judgment which denies St. Joseph Valley Seed Company's claim for interest, and remand to the district court with instructions to enter judgment for interest on the award of exemplary damages.
 
 
 
 *
 The Honorable Donald P. Lay was Chief Judge of the United States Court of Appeals for the Eighth Circuit at the time this case was submitted and took senior status on January 7, 1992, before the opinion was filed
 
 
 **
 The HONORABLE PAUL H. RONEY, Senior Judge, United States Court of Appeals for the Eleventh Circuit, sitting by designation
 
 
 [1]
 The Honorable William C. Hanson, Senior United States District Judge for the Northern District of Iowa
 
 
 [2]
 Nelson was Nickerson's business manager from 1976 until 1980 and its president from May 1980 until February 1982
 
 
 [3]
 The jury awarded the following amounts in compensatory damages to the respective plaintiffs: Settlemyre Seed Company, $27,490; Coomer Seeds, Inc., $71,280; St. Joseph Valley Seed Co., d/b/a M.F.I. Seeds, $92,077; Charles O. Laverty, d/b/a/ Laverty Seed Farm, $38,625; Diener Bros., Inc., $87,622; Shockney Seed Service, Inc., $11,139; Rupp Seeds, Inc., $74,230; Schettler Seed Farm, Inc., $74,061; The Ohio Grain Company, f/d/b/a Ohio Soil Service, Inc., $143,440; Latham Seed Company, $475,776
 
 
 [4]
 Nickerson's statute of frauds argument is without merit, since the agreement to renew the contract is separate from the agreement to distribute Nickerson's seed. The agreement to renew the contract could have been performed within one year, and the statute of frauds thus does not apply. See Johnson v. Ward, 265 N.W.2d 746, 747 (Iowa 1978); Hurd v. Ball, 128 Ind.App. 278, 143 N.E.2d 458, 464 (1957)
 
 
 [5]
 We find no merit in Nickerson's claims that it was deprived of a fair trial by plaintiffs' remarks during voir dire that some plaintiffs had settled with Nickerson and by plaintiffs' remarks during closing arguments that Nickerson had not called certain witnesses. The remarks during voir dire were made while several people were talking, and the district court properly found that they were not harmful. As to the remarks made during closing arguments, the jury received a preliminary instruction from the court to disregard counsel's spontaneous statements. Indeed, Instruction 21 specifically directed the jury that a party is not required to call all persons who may have knowledge of the case. Further, in Tyler v. White, 811 F.2d 1204, 1206-07 (8th Cir.1987), we held that there can be no error from such statements without a showing of prejudice affecting a substantial right of the objecting party. The burden of showing prejudice rests on the objecting party. Id. at 1207. Nickerson has failed to meet this burden. We presume that the jury followed the court's relevant instructions, and we find no error
 
 
 [6]
 For example, the district court's instruction on the applicable Michigan law regarding exemplary damages was some two pages in length. See Joint Appendix at 794-95
 
 
 [7]
 Nickerson submits that this court's concern in Union Nat'l Bank v. Mosbacher, 933 F.2d 1440, 1448 (8th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 870, 116 L.Ed.2d 775 (1992), about the constitutionality of the Arkansas law of punitive damages after Haslip casts doubt on the award in this case. We disagree. The portion of Mosbacher referenced by Nickerson is dicta, because this court explicitly refused to reach the constitutional due process issue and subsequently remanded Mosbacher to the district court for review in the light of Haslip. Id. Consequently, the Mosbacher dicta has no application to this case, especially given the district court's thorough review of the award under the seven factors mentioned in Haslip