Theodore Blair BURGHOFF, Debtor.

Michael Cain and Charlotte Cain, Plaintiffs,

v.

Theodore B. Burghoff, Defendant.

Bankruptcy No. 05–10947.
Adversary No. 05–30210.

United States Bankruptcy Court, N.D. Iowa.

May 21, 2007.

## ORDER RE: COMPLAINT TO ESTABLISH EXCEPTION TO DISCHARGE § 523 AND FOR DAMAGES

PAUL J. KILBURG, Bankruptcy Judge.

This matter came before the undersigned for trial on April 10 and 11, 2007. Plaintiffs Michael and Charlotte Cain were represented by Jay B. Marcus and John Courtade. Debtor/Defendant Theodore B. Burghoff appeared at trial pro se. After presentation of evidence and argument, the Court took the matter under advisement. The time for filing briefs has now passed and this matter is ready for resolution. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

### STATEMENT OF THE CASE

The Cains' complaint seeks exception of their claim from discharge pursuant to §§ 523(a)(2)(A), (a)(4) and (a)(6). The complaint also seeks a determination of damages for breach of fiduciary duty, conversion, breach of contract, negligence and gross negligence, and fraud.

Debtor and the Cains were partners in a securities trading firm called Speed Diamond. The Cains allege that Debtor misappropriated the funds they provided him, using these funds for personal use and various other investment schemes. The Iowa District Court for Jefferson County granted partial summary judgment to the Cains for breach of fiduciary duty, conversion, breach of contract, negligence and gross negligence. The court awarded the Cains $131,436 (less $41,000) in damages, leaving open the possibility that the Cains could recover further damages.

### FINDINGS OF FACT

Debtor Theodore Burghoff and Plaintiffs Michael and Charlotte Cain reside in Fairfield, Iowa. They became acquainted through the Maharishi University in Fairfield, where Debtor studied art and the Cains worked as art professors. After graduation in the late 1970s, Debtor briefly worked as an assistant to Mr. Caine. Debtor then moved to California, where he learned to sell and trade bonds and securities and worked odd jobs for several years.

In the early 1990s, Debtor returned to Fairfield to begin working with a college classmate, John Petit. Mr. Petit's business apparently involves buying new issue securities and other syndicated underwritings and quickly reselling them. Mr. Petit provided capital for Debtor, who used the funds to buy these securities. Debtor then conveyed the securities to Mr. Petit, who sold them and split any net profit with Debtor.

It appears that this business model was designed to circumvent limits on the number of security offerings available to any individual broker. According to the testimony of Debtor's accountant, new issue securities generally are made available only in very limited quantities. To get around these limits, Debtor opened dozens of brokerage accounts under various fictitious business names, creating the impression that the securities were being purchased by different entities. This allowed Debtor to purchase more offerings than he

could using a single name. The enterprise apparently demanded secrecy; Debtor did not feel at liberty to discuss with others his occupation or his professional relationship with Mr. Petit.

Despite Debtor's reticence to discuss his business, at some point the Cains became aware that he was involved in the investment business. In 1993, Debtor agreed to take the Cains' money and invest it for them. The Cains were apparently quite eager to earn a greater rate of return than they could otherwise obtain in the market. To this end, the Cains and Debtor formed an investment partnership called Speed Diamond. It is unclear whether Debtor or the Cains broached the idea of forming a partnership.

The Cains were to contribute capital to the partnership while Debtor was to manage the funds by purchasing and selling securities. The partners were to split the profits. It is unclear whether Debtor agreed to contribute any of his own funds to the partnership though the record does not reveal any contribution by Debtor. The Cains appear to have understood the general nature of Debtor's business, if not the particulars, and they were aware that Debtor was funded by a shadow partner. When the Cains learned that Debtor was in business with Mr. Petit, who was a family friend of the Cains, Debtor made them swear not to mention the Speed Diamond Partnership to Petit. The Cains profess to have been uncomfortable with this secrecy, but they complied with Debtor's request.

The Cains contributed $50,000 to the partnership initially, and an additional $81,436 in 1998. During the course of the partnership, Debtor made three disbursements to the Cains: $30,000 in 2000; $7,000 in 2003; and $4,000 in 2005. During the course of the partnership, Debtor periodically provided earnings reports to the Cains, and the Cains paid income tax based upon these reported earnings. The reports showed that the investment was yielding impressive returns. By 2003, the Cains' investment appeared to have swelled to more than $300,000. The evidence, however, indicates that the reports were utterly fictitious. In 2004, Debtor admitted to the Cains that in reality the partnership had no assets. The Cains' investment, as well as any profits earned through stock trading, if any, had disappeared. Debtor has been unable—or unwilling—to provide an accounting of these funds.

The question of what happened to the money was not answered in this trial. The evidence does show that Debtor handled the Cains' funds as if they were his own. He repeatedly misled the Cains about the status of their investment. He deposited the Cains' funds into a checking account, from which he made regular withdrawals for personal and "business" expenses. These expenses included payments on Debtor's home mortgage, guitar lessons, tennis lessons, astrological consultation, and home improvement expenses. The Cains' funds apparently were commingled with Debtor's personal funds, funds he received from Mr. Petit, and investment funds that he received from other sources.

Debtor has not provided an accounting for how any of these funds were used. It is possible Debtor truly believed, as he now self-servingly asserts, that early on he was earning significant profits. Given his good fortune, he appeared to think that there was more than enough money to justify his personal spending. In Debtor's words, "[m]oney that was spent by me during that period was always predicated upon the amount of revenues that were being generated, which were substantial. I was under the understanding that I would always have the opportunity to pay the Cains the money that they had invest-

ed with me." (Pls.' Ex. 9 at 55.) Debtor kept unprofessional records. How much profit was generated, if any, cannot be calculated using these records.

From his overall earnings, Debtor designated a certain amount each year as Speed Diamond profits. The methodology used to calculate "earnings" never was made clear, even to Debtor's accountant.[1] The evidence tends to show that the figure was based on nothing more than guesswork. Debtor reported this figure, as well as his expenses, to his accountant. Ultimately, an obviously frustrated accountant used the estimates provided by Debtor to create Speed Diamond K–1 tax forms. The Cains paid taxes based on these K–1s.

Given Debtor's interest in maintaining the use of the Cains' money, the Court concludes that the earnings stated on these forms were nothing more than generous estimates. Debtor's recollections support this interpretation. He provided an affidavit to the Iowa District Court, which states in pertinent part: "The partnership was created in the 'high flying' 90's, when it was hard not to make money in the various markets.... [T]he September 11, 2001 terrorist attacks were devastating to the funds I was investing. I found myself with basically no money and no good way to account to the Cains for the partnership funds.... Despite [my] representations ... the money was not there and the returns reflected ... vague notions, but very generous notions, of the value of the Cains' partnership funds." (Pls.' Ex. 35).

In August 2004, after Debtor finally admitted to the Cains that the partnership no longer had any assets, the Cains filed an action against Debtor in the Iowa Dis-

trict Court for Jefferson County. They alleged conversion, breach of contract, breach of fiduciary duty, common law fraud, and negligence. About a year later, the Cains filed a motion for summary judgment. Debtor filed a response and resistance to the Cains' summary judgment motion. Because these documents were filed about ten days late, however, the court did not consider them in ruling upon the Cains' motion for summary judgment.

In its ruling, the Iowa District Court granted the Cains' motion as to Debtor's liability for breach of contract, conversion, breach of fiduciary duty and negligence. The court ordered Debtor to pay damages of $131,436, reduced by the amount Debtor already had disbursed to the Cains, or $41,000. The court left undecided the extent to which the Cains could recover damages in excess of the minimum amount awarded through the summary judgment.

After the Cains obtained summary judgment, Debtor filed his Chapter 7 Petition. In response, the Cains filed this adversary complaint seeking an exception to discharge and the opportunity to prove the full extent of the damages they incurred.

## CONCLUSIONS OF LAW

The Cains ask that their claim be excepted from discharge under § 523(a). They must prove the elements of a § 523(a) claim by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

### § 523(a)(4)

The Cains claim that Debtor committed fraud and defalcation while acting in a

---

1. Debtor's accountant was unable to make sense of Debtor's bookkeeping—partly because Debtor only had records of stock purchases. Debtor did not provide his accountant with information about the stock sales performed by Mr. Petit. Instead, Debtor provided the accountant with profitability figures and expenses, and the accountant prepared the returns based on this information.

fiduciary capacity. Section 523(a)(4) of the Bankruptcy Code states that a Chapter 7 discharge does not discharge a debtor from any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

■ The Cains did not plead embezzlement or larceny in their original complaint. At the end of the trial, the Cains moved to add a claim of embezzlement to conform to the evidence offered at trial. Such an amendment is allowed only when "issues not raised by the pleadings are tried by express or implied consent of the parties." Fed.R.Civ.P. 15(b); Fed. R. Bankr.P. 7015. While the Cains did present evidence relevant to a claim of embezzlement, this same evidence was relevant to their other claims. As a result, Debtor lacked notice, making an amendment to conform to the evidence inappropriate. *See Pariser v. Christian Health Care Sys.*, 816 F.2d 1248, 1253 (8th Cir.1987). Accordingly, the Court denies this motion.

■ As to the other § 523(a)(4) claim, the Court notes that the term "fiduciary" in the bankruptcy context does not extend "to the more general class of fiduciaries ... including partners," absent special considerations. *In re Heister*, 290 B.R. 665, 673 (Bankr.N.D.Iowa 2003). No such considerations are present here. Because no fiduciary relationship exists, the Court finds that the § 523(a)(4) claims of fraud and defalcation while acting in a fiduciary capacity have no merit.

### § 523(a)(2)(A)

Section 523(a)(2)(A) excepts a debt from discharge if it is obtained by "false pretenses, a false representation, or actual fraud."

■ A creditor proceeding under § 523(a)(2)(A) must prove the following elements: (1) the debtor made false representations; (2) the debtor knew the representations were false at the time they were made; (3) the debtor made the representations with the intention and purpose of deceiving the creditor; (4) the creditor justifiably relied on the representations, *Field v. Mans*, 516 U.S. 59, 73–75, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995); and (5) the creditor sustained the alleged injury as a proximate result of the representations having been made. *In re Wheeler*, 317 B.R. 783, 788 (Bankr.N.D.Iowa 2004); *In re Van Horne*, 823 F.2d 1285, 1287 (8th Cir.1987).

■ The evidence shows that Debtor made false representations to the Cains throughout the partnership about the status of their investment. Debtor made these representations with the intent to deceive the Cains into believing that their investment was being managed profitably, so that he would have the continued use of their money. The Cains reasonably relied on Debtor's representations, keeping their money in the Speed Diamond partnership, and even investing more funds based on the apparent success of the venture. Their reliance on Debtor's false representations was the proximate cause of their financial loss.

Because all of the elements are satisfied, the Cains' claim is excepted under § 523(a)(2)(A).

### § 523(a)(6)

Section 523(a)(6) states that a Chapter 7 discharge does not discharge a debtor from any debt "for willful and malicious injury by the Debtor to another entity or to the property of another entity."

■ The term "willful" means deliberate or intentional. *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). Malice requires only that the conduct be targeted at the creditor, at least in the sense that the conduct is certain or almost certain to cause harm. *In re Scarborough*, 171 F.3d 638, 641 (8th

Cir.1999). Proof of malice does not require spite, ill will, or personal animosity. *In re Fors,* 259 B.R. 131, 137 (8th Cir. BAP 2001).

■ The evidence clearly shows that the Cains were injured by Debtor's willful conversion of their investment funds. Debtor used the funds entrusted to him by the Cains for his own personal use, as well as to fund various investment schemes that were not to the Cains' benefit. While the evidence does not show that Debtor harbored any ill will toward the Cains, it should have been clear to him that his reckless appropriation of their money for his own personal use almost certainly would cause them financial harm. For this reason, the Cains' claim is excepted from discharge under § 523(a)(6).

## DAMAGES

■ The Cains claim damages in the amount Debtor represented on the Speed Diamond earnings reports, adjusted to reimburse them for the improper expenses Debtor deducted. They rely on the doctrine of equitable estoppel, asserting that Debtor must pay them the amount he claimed was in the Speed Diamond account at the end of 2003, when the partnership was to be terminated. The Cains further claim that they are entitled to *all* of the Speed Diamond earnings, not just the 50 percent Debtor apportioned to them, because Debtor put none of his own money into the partnership and did nothing to earn a money manager's fee.

The Court has found, however, that the figures on these reports were based on nothing more than Debtor's conjecture. The evidence strongly suggests that Debtor had an incentive to create an overly rosy picture of Speed Diamond's performance so that he would have continued use of the Cains' funds. For these reasons, Debtor's estimation of the Plaintiff's earnings is not a reliable guide to damages.

This Court agrees with the state court that it would be inappropriate to "adjudge as correct an amount . . . based on misrepresentations." (Complaint Ex. A, pg. 4.)

■ The Cains are entitled to receive the amount of their initial investment, $131,436, less the disbursements that Debtor made to them. Because they lost the use of their funds during the period of the partnership, they also are entitled to a reasonable rate of return. The Court agrees with Debtor's suggestion that the Standard and Poor's 500 Index provides a reasonable guide to what the Cains might have earned in the market during the relevant period. (*See* Pls.' Ex. 34 and 35.)

The Court disagrees with Debtor's analysis in Exhibit 35, however, to the extent that he does not account for the dividends the Cains would have earned during that period. The S & P 500's *total return* performance—which assumes dividends and capital gains are reinvested as they accrue—provides a more realistic benchmark, given that the Cains received no dividend payments. The Cains invested $50,000 at the beginning of 1993 and an additional $81,436 at the beginning 1999. Debtor made disbursements of $30,000 in 2000; $7,000 in 2003; and $4,000 in 2005. Had the Cains invested the same amounts in an index fund that tracked the S & P 500, made the same withdrawals, and reinvested their dividends, the Cains would have accrued approximately $201,000 by the end of 2003, when the partnership was scheduled to terminate.

The Cains argue that a small- or mid-cap index would provide a more appropriate benchmark, given that Debtor invested in smaller, higher-risk companies than those represented in the S & P 500 Index. (Pls.' Ex. 34.) It is true that the Cains expected to beat the market when they arranged for Debtor to invest their funds. No doubt it was this expectation that led

them to go along with some of Debtor's more unconventional business practices, including his insistence on secrecy. Satisfying this expectation, however, goes beyond what is necessary to make them whole.

The Cains also claim they are entitled to pre- and post-judgment interest. When a bankruptcy court adjudicates a state law claim, the court applies state law regarding prejudgment interest. *In re Kroh Bros. Development Co.*, 91 B.R. 525, 535 (Bankr.W.D.Mo.1988). The Cains are entitled to 5 percent interest on the approximately $201,000 owed to them until they filed their action in state court under Iowa Code § 535.2(g). Taking into account the $4,000 disbursement in 2005, Plaintiffs' actual damages totaled approximately $218,000 at the time their lawsuit was filed. The Court finds that this is a reasonable measure of damages.

The Cains also are entitled to draw interest on this amount from the date they filed their state court lawsuit until payment "at a rate equal to the one-year treasury constant maturity published by the federal reserve in the H15 report settled immediately prior to the date of the judgment plus two percent." Iowa Code § 668.13. As of May 2, 2007, the one-year treasury constant maturity rate was 4.9 percent. This fixes the rate at 6.9 percent.

The Cains incurred some costs preparing tax returns and paying taxes based on the erroneous financial reports given to them by Debtor. The record, however, does not provide sufficient grounds for determining the amount of this cost to the Cains, and therefore no damages can be awarded.

The Cains also ask for punitive damages. "[P]unitive damages may be awarded for conversion if it is characterized by malice or willful disregard of the other party's rights." *In re Pester Refining Co.*, 845 F.2d 1476, 1487 (8th Cir.1988);

*Sandhorst v. Mauk's Transfer, Inc.*, 252 N.W.2d 393, 399 (Iowa 1977). The evidence clearly shows that Debtor acted with willful and wanton disregard for the Plaintiff's rights. Having promised to invest the Cains' funds, he appropriated the funds and used them as his own. Moreover, Debtor's conduct was directed at the Cains specifically. The evidence shows that Debtor knew he was using the Cains' funds to lead a lifestyle he could not otherwise maintain.

These findings satisfy two further determinations the Court must make before awarding punitive damages: (1) "Whether, by a preponderance of clear, convincing, and satisfactory evidence, the conduct of the defendant from which the claim arose constituted willful and wanton disregard for the rights or safety of another," and (2) "Whether the conduct of the defendant was directed specifically at the claimant, or at the person from which the claimant's claim is derived." Iowa Code § 668A.1. An award of punitive damages cannot be made without the first determination. *Id.* The second determination must be made if the Cains are to be awarded the full measure of punitive damages; otherwise, the Cains are entitled to only 25 percent of any award. *Id.* Again, both elements are easily satisfied here.

The goal of punitive damages is to punish a defendant for his conduct. *Latham Seed Co. v. Nickerson Am. Plant Breeders, Inc.*, 978 F.2d 1493, 1498 (8th Cir.1992). Such damages are appropriate in this case. Debtor had the use of Plaintiffs' money for more than a decade, and he has forced the Cains to go to great lengths to recover their funds. Debtor may have realized even more than the $218,000 awarded to the Cains; his lack of accounting has made it impossible for the Court to determine the extent of his gains from the use of the Cains' funds. In light of all this, the Court finds that $150,000 is

an appropriate amount to punish Debtor for his behavior toward the Cains.

■ Punitive damages are subject to some constitutional constraints. The proper inquiry for determining the appropriate amount of punitive damages is "whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred." *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 446, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993). The Court believes that $150,000 is an appropriate amount to punish Debtor for his conduct. This figure is reasonable in light of the $218,000 in damages he inflicted upon the Cains.

**WHEREFORE,** judgment is entered in favor of Plaintiffs Michael Cain and Charlotte Cain and against Defendant Theodore B. Burghoff in the amount of $218,000 in compensatory damages, plus interested at a rate of 6.9 percent from the time the Plaintiffs commenced their State court action.

**FURTHER,** judgment is entered in favor of Plaintiffs Michael Cain and Charlotte Cain and against Defendant Theodore B. Burghoff in the amount of $150,000 in punitive damages.

**FURTHER,** this claim is excepted from discharge pursuant to 11 U.S.C. § 523 for the reasons set forth herein.

**FURTHER,** since this judgment is duplicative of the partial judgment entered in Iowa District Court in Jefferson County, Plaintiffs shall satisfy that judgment to avoid double payment on a portion of this judgment.

**FURTHER,** judgment shall enter accordingly.