ECONOMY ROOFING & INSULATING CO., Appellant,

v.

Douglas ZUMARIS, Sharon Dietz, and Roofing Technology, Inc., Appellees.

No. 94–575.

Supreme Court of Iowa.

Sept. 20, 1995.

Brian S. Nelson and Stephen T. Fieweger of Katz, McAndrews, Balch, Lefstein, & Fieweger, P.C., Rock Island, Illinois, for appellant.

Robert H. Gallagher of Wells, Gallagher, Roeder & Millage, Bettendorf, for appellees.

Considered by HARRIS, P.J., and LAVORATO, SNELL, ANDREASEN, and TERNUS, JJ.

LAVORATO, Justice.

The former president and his mother left the employment of the plaintiff corporation. The son started a competing business. The plaintiff sued the son, the mother, and the competing business, alleging numerous claims for damages against them. Those claims include (1) breach of fiduciary duties as to the son, (2) intentional interference with contractual and business expectancies as to the son and the competing business, and (3) violation of the trade secrets act as to all three defendants. The jury ultimately returned a verdict in favor of the plaintiff and against the son for compensatory and punitive damages as to the breach of fiduciary duties claims. The district court granted the son a new trial on all issues.

In its appeal, the plaintiff challenges (1) a pretrial ruling, (2) a ruling on a motion for directed verdict, and (3) a ruling on a motion for new trial. We affirm in part, reverse in part, and remand with instructions.

I. *Background Facts.*

Economy Roofing and Insulating Company (Economy) installs roofs on commercial and residential buildings. It provides its services to large manufacturing facilities in the Quad Cities. Since the 1960s, Economy has held a series of service contracts with Aluminum Company of America (Alcoa). The contracts provided that Economy would perform "all identified maintenance roofing work" at Alcoa's Davenport facility.

James Deitz, Sr., was the sole shareholder, director, treasurer, and president of Economy until his death on May 10, 1989. James Sr.'s second wife, Sharon Zumaris Deitz, began working in Economy's office in 1985. In 1989 she became vice-president and secretary of Economy's board of directors.

Sharon's son Douglas Zumaris began employment with Economy in 1977 as a warehouse worker. In late 1985 or early 1986 James Sr. brought Douglas into the office to assist him with job estimates and running the office.

James Sr. died intestate. His heirs were his two children by his first marriage, James Deitz, Jr., and Debra Deitz. Neither child was active in the operation of Economy. Sharon was appointed as administrator of James Sr.'s estate.

Douglas was subsequently appointed as the new president of Economy. During his tenure as president, annual sales increased from $2,000,000 to $4,000,000. The company's net worth increased by $350,000. In February 1991, Douglas signed a contract on behalf of Economy with Alcoa to provide roofing maintenance services at the Davenport plant from February 1, 1991, to January 31, 1993.

Between May 1989 and March 1992, Douglas and Sharon engaged in repeated attempts to purchase Economy from James Jr. and Debra. At one point, Douglas threatened to leave Economy if his offer was not accepted. He later recanted, and did reach an agreement in principle with the heirs for the purchase of Economy. This deal ultimately fell through.

In January or February 1992, Timothy Richmiller and David Ostrom heard that Economy was for sale. They began investigating Economy's financial status with an eye toward making an offer. They had an initial meeting with Douglas and Sharon regarding the business. Douglas then made his final purchase offer to James Jr. and Debra. They rejected this offer, which was less than Richmiller and Ostrom's offer.

Richmiller and Ostrom had a second meeting with Douglas in early March. They asked Douglas if he would agree to stay on as president of Economy if someone else bought the business. Douglas said he was concerned that Richmiller would make Economy a nonunion shop. Douglas also said that he independently had been contacting Economy customers and purchasing equipment. At the end of March, Douglas realized that he would not be able to purchase Economy.

Douglas resigned on March 27. The week before his resignation, Douglas asked James Jr. and Debra for a bonus. They refused. Sharon then instructed the company bookkeeper to prepare a check for approximately $15,000 for twelve weeks vacation Douglas had allegedly accrued. This was done under an alleged policy manual provision that was

never adopted by Economy's board of directors. This provision, allowing employees with over five years of service three weeks vacation per year, was substantially different from the previous oral policy on vacation time. The oral policy allowed employees two weeks paid vacation per year for five or more years of service.

The day before Douglas' resignation, someone accessed the bid computer in Economy's office. Information stored on this computer allegedly included (1) correspondence to and from customers, (2) bid information, (3) bid estimates, (4) customer lists, (5) pricing lists, (6) profit margin reports, (7) supply cost information, and (8) other confidential bidding information. The majority of files allegedly were (1) viewed, (2) printed, and then (3) deleted or copied to a disk and removed. Douglas admitted that he had asked Sharon to access the bid computer on this date but only for personal information.

The chief mechanic at Economy testified that, before Douglas' resignation, Douglas asked him to perform substantial maintenance on Douglas' used roofing equipment. This was done on company time with company supplies. Douglas did not reimburse Economy for the materials or labor. He took this equipment with him when he resigned. He uses this equipment in his new business, Roofing Technologies, Inc. (Roofing). Roofing is in direct competition with Economy, and is providing services to several of Economy's former customers, including Alcoa.

In April 1992, Richmiller and Ostrom bought Economy from James Jr. and Debra for $397,000. Richmiller became Economy's president. Sharon and Douglas' wife resigned from Economy shortly thereafter.

## II. *Background Proceedings.*

Economy's initial petition of July 10, 1992, was in three divisions. Division I prayed for a temporary injunction, hearing, and permanent injunction enjoining Douglas, Sharon, and Roofing from (1) using any confidential information obtained from Economy, (2) soliciting business from Economy's customers based upon this confidential information, and (3) keeping this confidential information. Division II alleged wrongful appropriation of trade secrets against Douglas and Sharon. Division III prayed for the imposition of a constructive trust in favor of Economy and against Douglas, Sharon, and Roofing for Economy's equitable interest in Douglas' used roofing equipment and the profits derived therefrom.

The court held a hearing on Economy's application for a temporary injunction and denied Economy's request. The court also granted the defendants' unresisted motions to recast.

Economy's final amended petition against Douglas, Sharon, and Roofing was in ten divisions. Division I was against Douglas for intentional interference with a contract. Division II was against Roofing for intentional interference with a contract. Division III was against Douglas for interference with a prospective business advantage. Division IV was against Roofing for interference with a prospective business advantage. Division V was against Douglas for usurpation of a corporate opportunity. Division VI was against Douglas for breach of fiduciary duty. Division VII was against Douglas for punitive damages in the amount of $150,000. Division VIII was against Douglas for violation of the uniform trade secrets act. Division IX was against Sharon for violation of the uniform trade secrets act. Division X was against Roofing for the use of trade secrets.

Economy later filed a motion in limine to prohibit the defendants from presenting evidence at trial that the court denied its application for a temporary injunction. At the hearing on the motion immediately before trial, the court directed a verdict for all three defendants on divisions VIII, IX, and X, the trade secrets claims.

The case was tried to a jury. At the close of Economy's case, the court directed a verdict for Douglas and Roofing on divisions I, II, III, and IV, the interference with contract and prospective business advantage claims. The court concluded Economy failed to prove by substantial evidence that these two defendants had intentionally (1) interfered with a contract, and (2) interfered with a prospective business advantage.

At the conclusion of the five-day trial, the court submitted divisions V, VI, and VII—alleging usurpation of corporate opportunity, breach of fiduciary duty, and punitive damages—to the jury. The jury awarded Economy $30,000 in compensatory damages and $75,000 in punitive damages against Douglas.

The court denied Douglas' motion for judgment notwithstanding the verdict. The court, however, did grant Douglas' motion for new trial. The court concluded that (1) the jury had considered evidence on an issue that the court had withdrawn from the jury's consideration, (2) the punitive damage award was not supported by substantial evidence and was the result of passion or prejudice, and (3) the issues of compensatory and punitive damages were so intertwined that fairness to Douglas necessitated a new trial on liability and damages. *See* Iowa R.Civ.P. 243, 244.

### III. *The Pretrial Ruling.*

■ After the hearing on Economy's motion for temporary injunctive relief, the court entered the following ruling, stating in pertinent part:

> THE COURT FINDS that plaintiff fails to prove the business information and customer lists it asserts were taken by defendants constitute trade secrets. Thus, the statutory authority for issuance of a temporary injunction fails.

Before trial Economy filed a motion in limine regarding introduction of the court's denial of Economy's motion for temporary injunctive relief on the trade secrets claims. At a hearing on the motion immediately before trial began, the following colloquy occurred between Economy's counsel and the court:

> THE COURT: What is the motion in limine? Just give it to me briefly.
>
> ECONOMY'S COUNSEL: The main point of the motion in limine is there was a prior hearing in this case where there was a motion for preliminary injunction made and Judge Pelton heard and denied that. Our argument to the court is there is such a different standard on whether or not you can get an injunction and whether or not you can get monetary damages that we

feel that any decision by Judge Pelton or any reference to it would unduly prejudice the jury because they would not be able to understand the difference between the standards for obtaining an injunction or the standards for obtaining an award for money damages against the defendant.

> Judge Pelton I don't believe ever definitively ruled. He did say something to the effect that there was no—there is a failure of proof on certain issues, but that certainly wasn't a full hearing on the merits to decide the case. The hearing on the preliminary injunction isn't a final judgment on the merits. So there—I don't think Judge Pelton's decision should be referred to or brought to the attention of the jury.
>
> THE COURT: They certainly aren't trade secrets. There is no evidence that you could present that would establish them as trade secrets.
>
> ECONOMY'S COUNSEL: I believe I can present evidence that they are trade secrets.
>
> THE COURT: I understand that's what you believe, but that's the ruling of the court. What else do we have here[?]

In its ruling on Douglas' posttrial motions for judgment notwithstanding the verdict and new trial, the court concluded:

> *At the close of Plaintiff's evidence* the court directed a verdict in favor of defendants and against plaintiff on [the divisions concerning the trade secret claims] of plaintiff's amended petition.
>
> . . . .
>
> [T]he court's rulings with respect to the balance of divisions contained in plaintiff's amended petition and defendant's counterclaim shall stand.

(Emphasis added.)

Despite this statement, the parties agree that the court directed a verdict on the trade secrets claims at the motion in limine hearing immediately before trial. Economy believes the court erred in directing a verdict on these divisions. Economy thinks that in so doing the court denied it the chance to present evidence of trade secrets violations. Had it been allowed to present such evidence,

Economy maintains it would have generated a jury question on the trade secrets claims.

Sharon, Douglas, and Roofing contend that the district court properly directed a verdict in their favor on the trade secrets claims based upon the court's earlier denial of Economy's application for temporary injunctive relief.

Iowa Code section 550.3(1) (1991) provides that "[t]he owner of a trade secret may petition the district court to enjoin an actual or threatened misappropriation." Iowa Code section 550.4(1) provides that "an owner of a trade secret is entitled to recover damages for the misappropriation."

Iowa Code section 550.2(4) defines a trade secret as

information, including but not limited to a formula, pattern, compilation, program, device, method, technique, or process that is both of the following:

*a.* Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by a person able to obtain economic value from its disclosure or use.

*b.* Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Iowa Code § 550.2(4).

Iowa Code section 550.2(3) in pertinent part defines misappropriation as doing any of the following:

*a.* Acqui[ring] a trade secret by a person who knows that the trade secret is acquired by improper means.

*b.* Disclos[ing] or us[ing] a trade secret by a person who uses improper means to acquire the trade secret.

*c.* Disclos[ing] or us[ing] a trade secret by a person who at the time of disclosure or use, knows that the trade secret is derived from or through a person who had utilized improper means to acquire the trade secret.

Iowa Code § 550.2(3).

"Improper means" is defined as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage, including but not limited to espionage through an electronic device." Iowa Code § 550.2(1).

The trade secrets claims against Douglas and Sharon allege each one appropriated trade secrets belonging to Economy by taking such secrets and delivering them to Roofing. The trade secrets claim against Roofing alleges that the company received the trade secrets and is using them.

The trade secrets claims further allege that the trade secrets include information concerning Economy's operations that was in a computer word processor at Economy's office. The claims describe this information as including

correspondence to and from customers, bid information, bid estimates, customer lists, pricing lists, profit margin reports, supply cost information and other information that had been compiled at a considerable expense to Economy and had derived an independent economical value because it was not generally known to or ascertainable by proper means by competitors, and which was the subject of reasonable efforts by Economy to maintain its secrecy.

Contrary to the defendants' contentions, we think these allegations stated a trade secrets claim against all three of them. The district court dismissed these claims because it believed the information Economy claimed constituted trade secrets was not trade secrets. Apparently, the court thought—erroneously—that the nature of this information was such that it could never legally constitute trade secrets.

In a recent case we gave a broad interpretation of "information" that could legally constitute "trade secrets":

Under the plain language of [Iowa Code section 550.2(4)] "trade secret" is defined as "information" and eight examples of this term are provided. Although these examples cover items normally associated with the production of goods, "trade secrets" are not limited to the listed examples. Business information may also fall within the definition of a trade secret, including such matters as *maintenance of data on customer lists and needs, source of sup-*

*plies, confidential costs, price data and figures.* One commentator explains:

> Trade secrets can range from customer information, to financial information, to information about manufacturing processes to the composition of products. There is virtually no category of information that cannot, as long as the information is protected from disclosure to the public, constitute a trade secret.

We believe that a broad range of business data and facts which, if kept secret, provide the holder with an economic advantage over competitors or others, qualify as trade secrets.

*US West Communications, Inc. v. Office of Consumer Advocate,* 498 N.W.2d 711, 714 (Iowa 1993) (citations omitted).

■ The defendants concede that, under this language in *US West,* business information as alleged in Economy's petition could constitute trade secrets. But, the defendants argue, the information Economy claims constitutes trade secrets does not constitute trade secrets for several reasons. First, the information the petition alleges Douglas and Sharon took was not kept secret because the information was available to them at all times. Second, employees who leave one employer to work for a competitor or to establish their own businesses take with them (1) knowledge which they acquired at their former employment, and (2) acquaintances with the business world. Last, the ruling on the request for temporary injunction held that Economy failed to prove this information constitutes trade secrets. We disagree with each of these reasons.

In *Norand Corp. v. Parkin,* 785 F.Supp. 1353 (N.D.Iowa 1990), the court granted a former employer a temporary restraining order preventing a former employee from accepting a position with the employer's primary competitor. The court's determination to grant the order was based on the likely existence of the employee's fiduciary duty to maintain the secrecy of trade secrets and confidential business information of the employer. *Id.* at 1355. In making this finding of such a fiduciary duty, the court relied in part on the definition of "misappropriation" in Iowa Code sections 550.2(3)(b) and 550.2(3)(d) and "improper means" in Iowa Code section 550.2(1). *Id.; see also* Iowa Code §§ 550.2(3)(b) ("[d]isclosure or use of a trade secret by a person who uses improper means to acquire the trade secret"); 550.2(3)(d) ("[d]isclosure or use of a trade secret by a person who at the time of disclosure or use knows that the trade secret is acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use"); 550.2(1) (*"Improper means"* means ... breach of a duty to maintain secrecy....").

In *Kendall/Hunt Publishing Co. v. Rowe,* 424 N.W.2d 235, 243 (Iowa 1988), we found that a fiduciary relationship existed between an employee and his former employer. We relied on this definition of fiduciary relation in Restatement (Second) of Torts section 874 comment *a* (1979):

> A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.

Restatement (Second) of Torts § 874 cmt. a (1979).

In another case we cited with approval this definition of a fiduciary relationship from Black's Law Dictionary:

> [fiduciary relationship is a] very broad term embracing both technical fiduciary relations and those informal relations which exist wherever one man trusts in or relies upon another. One founded on trust or confidence reposed by one person in the integrity and fidelity of another. A "fiduciary relation" arises whenever confidence is reposed on one side, and domination and influence result on the other; the relation can be legal, social, domestic, or merely personal. Such relationship exists when there is a reposing of faith, confidence and trust, and the placing of reliance by one upon the judgment and advice of the other.

*Kurth v. Van Horn,* 380 N.W.2d 693, 695–96 (Iowa 1986) (citing Black's Law Dictionary 564 (5th ed. 1979)).

In *Kurth,* we noted that some relationships necessarily give rise to a fiduciary relationship such as between attorney and client, guardian and ward, and *principal and agent.*

*Id.* at 696. We also noted that one of the indicia of a fiduciary relationship includes the acting of one person for another. *Id.* Finally, we recognized that "circumstances giving rise to a fiduciary duty are so diverse, any such relationship must be evaluated on the facts and circumstances of each individual case." *Id.* It was for these additional reasons that in *Norand* the court found that "a fiduciary relationship is likely to exist between [the former employer and former employee]." *Norand,* 785 F.Supp. at 1355 (citing *Kendall/Hunt Publishing Co. v. Rowe,* 424 N.W.2d 235, 243 (Iowa 1988) (quoting *Kurth v. Van Horn,* 380 N.W.2d 693, 695 (Iowa 1986) and Restatement (Second) of Torts § 874 cmt. a (1979))).

It is true, as the defendants contend, that the information in the computer was readily available to Douglas and Sharon. But this contention begs the question. The real question is whether, as employees, Douglas and Sharon had a fiduciary duty to keep this information secret.

As *Kurth* recognizes, a principal and agent relationship necessarily gives rise to a fiduciary relationship. And a principal and agent relationship necessarily includes an employer and employee relationship. Employees constantly act on behalf of employers. In doing so, employees have the confidence and trust of their employers. That is the essence of the relationship.

Given this relationship and the definition of "misappropriation" in Iowa Code chapter 550, we think a fact finder could easily find that Douglas and Sharon had a fiduciary duty to maintain the secrecy of the information Economy described as trade secrets. Suffice it to say that the district court should have allowed Economy to present evidence on whether (1) the information in the computer constituted trade secrets under the statutory definition of trade secrets, and (2) Sharon and Douglas had a fiduciary duty to maintain the secrecy of this information.

■ Moving on to the defendants' second reason, we agree that employees can take with them general knowledge acquired during their employment. But the allegation here was quite different: Sharon and Douglas surreptitiously copied or stole such information and provided it to Roofing, Economy's competitor.

■ As to the defendants' third reason, we think the district court's ruling on the temporary injunction was not dispositive of whether the information in the computer was a trade secret. A temporary injunction is a preventive remedy to maintain the status quo of the parties before final judgment and to protect the subject matter of the litigation. *Kleman v. Charles City Police Dept.,* 373 N.W.2d 90, 95 (Iowa 1985). Generally, a denial of a temporary injunction does not deprive a plaintiff of the right to a trial on the merits of the petition seeking a permanent injunction, nor is it an adjudication against such right. *Iowa City v. Muscatine Dev. Co.,* 258 Iowa 1024, 1033, 141 N.W.2d 585, 591 (1966). And, more significantly, the function of a preliminary injunction is not "to determine the merits of a case, or to decide controverted facts; and it is not a means for obtaining a piecemeal adjudication of the merits." 43 C.J.S. *Injunctions* § 5, at 745–46 (1978). *See also Boylston Housing Corp. v. O'Toole,* 321 Mass. 538, 544–45, 74 N.E.2d 288, 293 (1947) (a decree for a temporary injunction entered upon a finding of facts is not a final decree; it does not constitute an adjudication of the facts on which it was based under the doctrine of res judicata; so the judge who heard the suit on the merits is not precluded from reconsidering the facts upon which the temporary decree was based).

Here whether the information in the computer constituted a trade secret was a mixed question of law and fact. We have already concluded that the information in the computer could constitute a trade secret under the first part of the definition of trade secret in section 550.2(4) (*"Trade secret"* means information, including but not limited to a formula, pattern, compilation, program, device, method, technique, or process....). That is the legal part of the question.

The fact part of the question arises from the remaining portion of the definition of trade secret in section 550.2(4):

*"Trade secret"* means information ... that is both of the following:

   *a.* Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by a person able to obtain economic value from its disclosure or use.

   *b.* Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Iowa Code § 550.2(4).

Here the judge who denied the temporary injunction did so solely on the basis that the information in the computer was not the kind of information that could constitute a trade secret under the statutory definition. Thus at this stage of the proceedings the court only considered the legal part of the mixed question of law and fact on whether the information in the computer constituted a trade secret. The court's conclusion on this part of the question was, of course, erroneous. No findings were made as to the factual part of the question.

Economy should have been allowed a hearing on the merits regarding its request for permanent injunction and monetary damages on its trade secrets claims. At this hearing, Economy should have been allowed to present evidence as to whether factually the information in the computer constituted a trade secret. By its summary ruling on the motion in limine, the district court denied Economy such a hearing. It was reversible error to do so.

### IV. *The Directed Verdict Ruling.*

Economy contends the district court erred by directing a verdict for Douglas and Roofing at the close of Economy's case on divisions I, II, III, and IV dealing with intentional interference with a contract, and intentional interference with a prospective business advantage. Economy believes it generated a fact question entitling it to go to the jury on each theory.

Douglas and Roofing retort that even when the evidence is viewed in the light most favorable to Economy, it failed to generate a fact question on either theory. Therefore,

they conclude, the court properly directed a verdict in their favor.

In considering whether the district court correctly sustained the motion for directed verdict, we view the evidence in the light most favorable to the party opposing the motion. Iowa R.App.P. 14(f)(2). If reasonable minds could differ on an issue of fact, the issue is for the jury.

■ *A. Intentional interference with a contract.* Under Iowa Civil Jury Instruction 1200.1, the elements of intentional interference with a contract applicable to the facts here are:

1. Economy had a contract with Alcoa.
2. Douglas and Roofing knew of the contract.
3. Douglas and Roofing intentionally and improperly interfered with the contract.
4. The interference caused Alcoa not to perform the contract.
5. Economy sustained damages in excess of $50,000.

The contract at issue between Economy and Alcoa was dated February 14, 1991, and covered the period between February 1, 1991, and January 31, 1993. It pertinently provided as follows:

### SECTION I. STATEMENT OF WORK.

Contractor shall complete, and shall furnish all supervision, labor, materials, tools, equipment, loading, unloading, hauling, and other things necessary for the completion of miscellaneous roofing repairs, resurfacing and replacement work *as may be requested in writing by Owner's Procurement Manager* for the period from 1991 February 01 to 1993 January 31 at Owner's Davenport, Iowa Works as herein specified (herein called the "Work").

  . . . .

### SECTION III. SPECIAL AGREEMENTS.

  . . . .

  *B. Requests for work to be completed shall be in writing* by Site Work Order showing the specific location, scope of

work, starting and completion dates; as such become known to Owner.

. . . .

### SECTION IV. SCHEDULE.

*Contractor agrees that the Work shall be performed as mutually agreed upon at time of issuance of Site Work Order.*

. . . .

### SECTION VI. SOLE AGREEMENT.

*The Contract constitutes the entire agreement between the Contractor and Owner* and shall be governed by the laws of the Commonwealth of Pennsylvania.

(Emphasis added.)

In directing a verdict for Douglas and Roofing on the intentional interference with contract claims, the court was persuaded that the agreement between Economy and Alcoa was nothing more than an executory contract. An executory contract is defined as "[a] contract that has not as yet been fully completed or performed." Black's Law Dictionary 570 (6th ed. 1990). One commentator has taken the position that the phrase executory contract is misleading:

> Legally, however, since the term contract is defined in terms of promise, requiring that something be done in the future, there can be no such thing as an executed contract. By the same token, the phrase executory contract is misleading; all contracts, by definition, are executory. When they cease to be so, they cease to be contracts at all.

1 Samuel Williston, *Williston on the Law of Contracts* § 1:20, at 49 (Richard A. Lord 4th ed. 1990).

By its remarks, we think the district court meant the agreement between Economy and Alcoa was unenforceable and as such could not form the basis for an action for intentional interference with a contract. A split of authority exists on the question whether only valid and enforceable contracts can support an action for intentional interference with a contract. *See, e.g.,* James O. Pearson, Annotation, *Liability for Interference With Invalid or Unenforceable Contract,* 96 A.L.R.3d 1294, 1309–12 (1979). We assume without deciding that only valid and enforceable contracts can support an action for intentional interference with a contract. We do so because that is the way the parties have argued the case to us.

■ The agreement between Economy and Alcoa is unenforceable because it lacks mutuality of obligation. Mutuality of obligation requires that unless both parties to an agreement are bound, neither is bound. *Wickham & Burton Coal Co. v. Farmers' Lumber Co.,* 189 Iowa 1183, 1186–92, 179 N.W. 417, 418–20 (1920) (Because a promise to be consideration for another promise must be enforceable, an agreement of sale at a certain price of all the coal the buyer "would want to purchase" from the seller was, so far as it remained executory, not an enforceable contract. Because the buyer was under no binding obligation, the agreement lacked mutuality of obligation. Part performance by shipment of several carloads of coal under the agreement did not support a breach of contract action based on the seller's refusal to ship more.).

Economy contends the agreement is ambiguous, because "[s]ection [one] does not by its express terms, state to whom the written request[s] for work are required to go, before the contractor is to complete work under the contract." One interpretation of section one—Economy says—could be that the section required Economy to perform all roofing work Alcoa in writing requested other roofing contractors to perform during the agreement period.

Because Economy contends the agreement terms are ambiguous, Economy relies on (1) Economy being the only contractor to do maintenance work for Alcoa since 1985, and (2) a letter from Economy to Alcoa dated January 13, 1992, listing the maintenance schedule Economy intended to provide Alcoa for 1992. These two facts—Economy argues—are evidence of both parties' intention that Economy be Alcoa's sole maintenance provider through December 1992. By this evidence, Economy thinks it generated a fact question on what Economy and Alcoa intended to contract for, precluding a directed verdict in favor of Douglas and Roofing on

divisions I and II, the intentional interference with contract claims. We disagree.

We see no ambiguity in the terms of the agreement relied upon here. Under the plain language quoted above, Economy agreed to provide maintenance services to Alcoa after receiving a written work order from Alcoa specifying what maintenance work was to be done.

There is no record evidence suggesting that Alcoa sent Economy any work orders. All of Economy's evidence tends to prove what Economy alone intended to contract for. This, of course, is insufficient proof of mutuality of obligation. Alcoa was not bound to request that Economy do any work. The agreement clearly did not prevent Alcoa from using other contractors. In these circumstances, there was a lack of mutuality of obligation. No valid enforceable contract would arise until Alcoa requested in writing that Economy do the work and Economy agreed to do so.

The district court correctly sustained Douglas' and Roofing's motion for directed verdict as to divisions I and II, the intentional interference with contract claims.

B. *Intentional interference with a prospective business advantage.* Under Iowa Civil Jury Instruction 1200.2, the elements of intentional interference with a prospective business advantage applicable to the facts here are:

1. Economy had a prospective [contractual relationship] [business relationship] with Alcoa.

2. Douglas and Roofing knew of the prospective relationship.

3. Douglas and Roofing intentionally and improperly interfered with the relationship.

4. The interference caused Alcoa not to continue the relationship.

5. Economy sustained damages in excess of $50,000.

■ A binding contract is not necessary to support a claim of interference with prospective business advantage. Such a claim may be based upon a prospective business relationship that has not yet been reduced to a contract. *Nesler v. Fisher & Co.,* 452 N.W.2d 191, 196 (Iowa 1990).

■ Iowa Civil Jury Instruction 1200.7 defines prospective business relationship as "a reasonably likely contract of financial benefit to the plaintiff" or "a reasonably likely business relationship of financial benefit to the plaintiff." *See also* Restatement (Second) of Torts § 766B cmt. c. Viewing the evidence in the light most favorable to Economy, we think the jury could reasonably find that (1) the written agreement between Economy and Alcoa, and (2) the fact that Economy had been performing all maintenance work at the Alcoa plant since 1985 constituted a prospective business relationship. To the extent it sustained the motion for directed verdict as to divisions III and IV because there was no binding contract, the court erred.

The only other ground the district court relied on was that Douglas and Roofing did not intentionally and improperly interfere with the relationship between Economy and Alcoa. Iowa Civil Jury Instruction 1200.6 defines intentional interference this way:

A defendant's interference with a [contract] [prospective contractual relationship] [prospective business relationship] is intentional if the defendant either interferes with the [contract] [prospective contractual relationship] [prospective business relationship] on purpose or knows the conduct is substantially certain to interfere with the [contract] [prospective contractual relationship] [prospective business relationship].

2 Iowa Civil Jury Instructions 1200.6 (1992). *See also* Restatement (Second) of Torts § 766 cmt. j. Uncontroverted testimony established that before leaving Economy, Douglas solicited Alcoa to leave Economy and do business with his new business. The jury could reasonably infer from this evidence that Douglas (1) interfered with Economy's prospective contractual or prospective business relationship on purpose, or (2) knew his conduct was substantially certain to interfere with this relationship.

Iowa Civil Jury Instruction 1200.8 defines improper interference as follows:

A defendant's interference with a [prospective contractual relationship] [prospective business relationship] is improper if the defendant's interference is done with [the purpose] [the predominant purpose] of financially harming or destroying the plaintiff's business.

2 Iowa Civil Jury Instructions 1200.8 (1991). *See also Nesler*, 452 N.W.2d at 199 (recognizing that a purpose to injure or destroy is essential for the tort of interference with a prospective business advantage and is not essential for the tort of interference with a contract). *Compare* Uniform Jury Instruction 1200.5 (definition of "improper" for tort of interference with contract) *with* Uniform Jury Instruction 1200.8 (definition of "improper" for tort of interference with prospective business advantage).

In deciding whether Douglas and Roofing improperly interfered with Economy's prospective contractual or prospective business relationship with Alcoa, we think the jury could consider Douglas' other actions just before and after he left Economy. There was evidence from which the jury could reasonably find that Douglas took the following actions against Economy.

Besides Alcoa, Douglas solicited the business of other Economy customers for his new business while he was still working for Economy. Douglas was buying equipment for his new business and using Economy supplies and employees to recondition this equipment. Douglas took valuable customer and bid information from Economy's computer that he could use in his new business to put Economy at a competitive disadvantage. He deleted this information from the computer to put Economy at a further competitive disadvantage. Additionally, Douglas was contacting Economy key personnel in an effort to persuade them to leave Economy and work for him in his new business. He took funds in excess of $15,000 for vacation time to which he was not entitled. Finally, Roofing performed approximately $350,000 worth of work for Alcoa. Had Economy done the work, its profit would have been in excess of $50,000.

Under Douglas' management, Economy's overall sales had increased from $2,000,000 to $4,000,000 and the company's net worth had increased by $350,000. Yet he was unable to convince the heirs to sell him the business. In view of this evidence, the jury could reasonably infer that Douglas was harboring ill will toward the heirs and that all of his actions against Economy were in retaliation for this failed business opportunity.

In any event, we think from all of this evidence, the jury could find that Douglas' dealings with Alcoa were just a part of Douglas' scheme to financially harm or destroy Economy's business. In short, this evidence generated a fact question on whether Douglas and Roofing improperly interfered with Economy's prospective contractual or prospective business relationship with Alcoa. It was reversible error to sustain the motion for directed verdict on divisions III and IV.

## V. *The Posttrial Ruling.*

As mentioned, the district court submitted divisions V, VI, and VII against Douglas. These divisions alleged usurpation of corporate opportunity, breach of fiduciary duty, and punitive damages. The jury awarded Economy $30,000 in compensatory damages and $75,000 in punitive damages.

Douglas filed a motion for judgment notwithstanding the verdict and motion for new trial. The district court overruled the motion for judgment notwithstanding the verdict but sustained the motion for new trial as to all three divisions.

The district court granted the motion for new trial for the following reasons. First, the punitive damage award was (1) predicated upon evidence extraneous to the issues, and (2) "so large as to be conclusively the result of passion and prejudice which shocks the conscious of the court." Second, although there was sufficient evidence to support the $30,000 compensatory damage award, the issues involving compensatory and punitive damages "seem intertwined to the extent that, remittitur of punitive damages being forbidden, it is necessary to order a new trial on all issues submitted to the jury to effectuate justice between the parties."

Economy challenges this ruling, contending the district court erred as to each reason. We agree.

## A. *The punitive damage award.*

■ 1. *Extraneous evidence.* Economy contends the district court erred as a matter of law when it granted Douglas' motion for new trial based upon affidavits of two jurors. These affidavits alleged that the punitive damage award was based solely on lost profits Economy sustained after Douglas had left. Those profits resulted from Douglas' activities with customers of Economy.

In its posttrial ruling, the district court stated the jury should not have considered such evidence because the court had withdrawn the issues of intentional interference with contract and prospective business advantage from the jury's consideration. The court ruled that the evidence of lost profits was extraneous and prejudicial information improperly brought to the jurors' attention. Relying on the extraneous information exception in Iowa Rule of Evidence 606(b), the court held it could consider these affidavits.

■ Iowa Rule of Evidence 606(b) is identical to Federal Rule of Evidence 606(b). The Iowa rule provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

Iowa R.Evid. 606(b). In *Ryan v. Arneson,* 422 N.W.2d 491, 495 (Iowa 1988), we adopted the federal interpretation of the rule precluding a trial court from considering "juror arguments, statements, discussions, mental and emotional reactions, votes, and any other feature of the process occurring in the jury room." In short, under the rule, jurors are incompetent to testify to any matters or statements occurring in the course of deliberation. *Id.*

Here the jurors' affidavits fell within this prohibition. The affidavits are based on statements, discussions, and mental processes occurring during the course of deliberations. The affidavits are nothing more than an attempt to prove the deliberation process and to find out how and why the jury reached its verdict.

The exception in rule 606(b)—"extraneous prejudicial information"—refers to information that was not part of the record and not presented in court. *See, e.g., State v. Johnson,* 445 N.W.2d 337, 340 (Iowa 1989) (hearsay and rumor based on personal knowledge of juror about defendant); *Fischer, Inc. v. Standard Brands, Inc.,* 204 N.W.2d 579, 584–86 (Iowa 1973) (juror conducted experiment and communicated results to the jury). Here, in contrast, the evidence of lost profits was presented in court and was subject to cross-examination and evidentiary rulings of the court.

We conclude the district court committed reversible error when it considered the affidavits. The court should not have granted a new trial based upon these affidavits.

■ 2. *Sufficient evidence to support the punitive damage award.* The district court ruled that the punitive damage award lacked evidentiary support because "[v]ery little evidence was introduced of [Douglas'] financial condition upon which, at least in part, the punitive damages are to be based."

■ We have never held that evidence of a defendant's financial condition is a prerequisite to an award of punitive damages. We agree with those states that do not require such evidence to support the punitive damage award. *See, e.g., Nienstedt v. Wetzel,* 133 Ariz. 348, 357, 651 P.2d 876, 885 (Ct.App. 1982); *Carrick v. McFadden,* 216 Kan. 683, 688–90, 533 P.2d 1249, 1254 (1975). *See also Latham Seed Co. v. Nickerson Am. Plant*

*Breeders, Inc.,* 978 F.2d 1493, 1498–99 (8th Cir.1992) (reviewing Indiana, Iowa, Michigan, and Ohio law and concluding that "[n]one of these states requires a plaintiff to prove a defendant's financial worth before it can recover punitive damages").

In addition, we agree with Economy that there was in fact evidence of Douglas' financial condition before the jury. Before he left Economy, Douglas (1) was making $66,000 per year, (2) had received $15,000 in vacation pay, and (3) owned more than $34,000 of equipment which represented only five percent of the equipment he owned.

Finally, courts that have considered the issue have reasoned that the defendant should bear the burden of introducing evidence of lack of financial resources to pay a punitive damage award. *See, e.g., Latham Seed,* 978 F.2d at 1499; *George v. Bolen,* 2 Kan.App.2d 385, 393–94, 580 P.2d 1357, 1365 (1978). On this point the *George* court said this:

> By his petition, plaintiff sought $1,000,000 in punitive damages. Defendants were vulnerable to an award in that amount throughout these proceedings. If defendants were impecunious, or even relatively so, vis a vis this prayer, it may have behooved them to advance their own evidence of their financial worth.

*George,* 2 Kan.App.2d at 393, 580 P.2d at 1365.

Here, too, Economy was asking for punitive damages in a relatively large amount—$150,000. The district court made it clear it was submitting the punitive damage issue to the jury after overruling Douglas' motion for directed verdict on this issue. As in *George,* Douglas knew he was vulnerable for an award of punitive damages. Because he did not introduce evidence of his lack of resources to pay punitive damages, he cannot now complain because of the lack of such evidence.

▮ 3. *Punitive damages—the result of passion and prejudice.* The district court's final reason to set aside the punitive damage award was—in its own words—that the award was "so large as to be conclusively the result of passion and prejudice which shocks the conscience of the court." Punitive damages are allowed to punish the defendant and to deter the defendant and like-minded individuals from committing similar acts. *Ryan,* 422 N.W.2d at 496. In reviewing the punitive damage award for excessiveness, we focus on the relationship between a punitive damage award and the wrongful conduct of the offending party. *Id.*

▮ Here Douglas' actions involved intentional, willful conduct designed to financially harm Economy. As Economy points out, there was substantial evidence that Douglas concocted a vacation policy for his benefit, took corporate opportunities for his benefit, stole computer information for his advantage, and damaged Economy's property in an attempt to injure Economy's business under new management.

Significantly, the jury awarded only half of the $150,000 Economy requested for punitive damages. In similar circumstances we said that

> [i]f the verdicts were the result of passion and prejudice, and intended by the jury as punishment, it is likely the jury would have awarded the full amount allowable under the pleadings and instructions.

*Northrup v. Miles Homes, Inc.,* 204 N.W.2d 850, 860–61 (Iowa 1973). We think the evidence we have sketched out above more than adequately establishes that the $75,000 award for punitive damages was reasonably related to Douglas' wrongful conduct. Because there was substantial evidence to support the punitive damage award, the district court should not have granted a new trial merely because it disagreed with the jury's assessment. *See id.* at 861 ("Where ... the disputes are principally factual, and there is substantial evidence to support the jury's determination of these facts, the judge should not grant a new trial merely because reasonable men might disagree with the jury's conclusion."); *Houvenagle v. Wright,* 340 N.W.2d 783, 785 (Iowa Ct.App.1983) (district court should not set aside verdict on motion for new trial simply because it might have reached a different conclusion).

We find no basis in the record to support the district court's conclusion that the puni-

tive damage award was excessive and resulted from passion and prejudice. Accordingly, we conclude the district court erred in ordering a new trial on this ground. *Cf. Northrup*, 204 N.W.2d at 861 (district court did not err in refusing to set aside award for punitive damages; appellate court concluded that such award neither shocked its conscious, nor was excessive "in light of the despicable conduct of defendants").

B. *Ordering a new trial on all the issues.* As mentioned, the district court granted a new trial on all the issues even though it concluded there was substantial evidence to support the $30,000 compensatory damage award. The court did so because it thought the issues involving the compensatory damage and punitive damage awards were intertwined. In view of our conclusion that the district court should not have disturbed the punitive damage award, we cannot uphold the district court's reasoning granting a new trial on all the issues.

For all these reasons we conclude the verdicts for compensatory damages and punitive damages should be reinstated.

VI. *Disposition.*

Because the district court committed reversible error in summarily rejecting the trade secrets claims, we reverse and remand for further proceedings on divisions VIII, IX, and X consistent with this opinion.

The evidence was insufficient to establish the contractual element of the intentional interference with contract claim. So we leave undisturbed the district court's directed verdict ruling on divisions I and II, the intentional interference with contract claims.

However, there was sufficient evidence to submit the intentional interference with prospective business advantage claims. So we reverse and remand for further proceedings consistent with this opinion as to divisions III and IV.

As to the punitive damage award we conclude as follows. First, the court committed reversible error when it considered jurors' affidavits indicating the jury considered allegedly improper evidence regarding lost profits. The court should not have granted a new trial based on these affidavits. Second, evidence of a defendant's financial condition is not a prerequisite to an award of punitive damages. The award did not therefore lack evidentiary support because of an alleged lack of such evidence. Third, there was substantial evidence to support the compensatory damage award. There was also substantial evidence that the amount of the punitive damage award was reasonably related to Douglas' wrongful conduct. There was nothing in the record to suggest that the punitive damage award was excessive and the result of passion and prejudice. We conclude, therefore, that the district court erred in granting a new trial on all the issues. We reverse and remand for reinstatement of the compensatory and punitive damage awards.

We have not addressed the question of duplicative damages on the claims left to be tried since neither party addressed it. We leave that question for the district court to resolve.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.**